**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**RIC-MAN CONSTRUCTION, INC.**                         **CASE NO.**
**a Michigan corporation,**
      **Plaintiff,**

**v.**

**PIONEER SPECIAL RISK INSURANCE**
**SERVICES, INC., d/b/a PIONEER**
**UNDERWRITERS, [a <u>foreign</u> Corporation],**
      **Defendant.**

---

## <u>COMPLAINT FOR DECLARATORY JUDGEMENT</u>

Plaintiff Ric-Man Construction Inc. ("Ric-Man"), through its attorneys, McAlpine PC, and for its Complaint for Declaratory Judgment against Defendant Pioneer Special Risk Insurance Services Cross Environmental Services, Inc., d/b/a Pioneer Underwriters ("Pioneer"), states as follows:

## <u>NATURE OF THE ACTION</u>

1.    This is an insurance coverage action seeking declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

2.    Ric-Man seeks a declaration that Pioneer has a duty to defend Ric-Man with respect to a claim presented in a separate matter (the "Lawsuit") pursuant to the Contractors Pollution & Professional Liability Insurance policy (the "Policy") issued to Ric-Man by Pioneer. *See Policy attached as Exhibit A.*

3.      Specifically, the Lawsuit involves allegations against Ric-Man associated with Ric-Man's design of a dewatering system used in connection with the construction of a Combined Overflow Sewer ("COS") [1] that resulted in the elimination of countless residential wells.

## PARTIES, JURISDICTION AND VENUE

4.      Ric-Man is a corporation organized under the laws of the State of Michigan with its principal place of business located at 58600 Van Dyke Rd. Suite 100, Sterling Heights, Michigan.

5.      Pioneer is a corporation organized under the laws of the State of California with its principle place of business located at 48 Wall Street, 17th Floor, New York, New York.

6.      This Court has subject matter jurisdiction over this action for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

7.      An actionable controversy between Ric-Man and Pioneer exists within the meaning of 28 U.S.C. §§ 2201 regarding whether Pioneer has a duty to defend or indemnify Ric-Man under the terms of the Policy with respect to those claims made in the Lawsuit.

8.      This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and the suit is between citizens of different states.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that a substantial part of the events giving rise to this claim occurred in this judicial district.

---

[1] CSO tunnels are intended to collect rainwater runoff, domestic sewage, and industrial wastewater in the same pipe prior to transporting all of their wastewater to a sewage treatment plant, where it is treated and then discharged to a water body.

## THE UNDERLYING LAWSUIT

10.     On May 29, 2018, Wade Trim Associates, Inc. ("Wade Trim") filed the Lawsuit in in Wayne County Circuit Court (Case No. 18-005697-CB), which included a breach of contract claim against Oakland County Water Resources Commissioner ("OCWRC") seeking payment for Wade Trim's design of the COS and a claim of breach of contract against Ric-Man seeking indemnification under the terms of Ric-Man's "Contract" with OCWRC. *See "Complaint" attached as Exhibit B.*

11.     Wade Trim's alleges that it is entitled to defense and indemnification by Ric-Man on the basis that Ric-Man had breached its contract with OCWRC because of "Ric-Man's improper dewatering operations that Ric-Man improperly implemented and/or implemented dewatering operations contrary to the requirements of the Contract and in contradictions to the manner indicated in its submittals." *Id., at ¶ 34.*

12.     However, Wade Trim failed to allege that it is entitled to defense and indemnification due to Ric-Man's failure to properly design a dewatering system associated with Ric-Man's construction of the COS.

13.     On April 19, 2019, OCWRC filed a Cross Claim against Ric-Man in the Lawsuit, alleging the following;

- Failure to properly design groundwater control systems;

- Failure to account for the possibility of damage to residential wells and damage to Middlebelt Road;

- Failure to advise OCWRC that groundwater-control activities might impact surrounding structures and residential wells;

- Damages to existing structures while operating groundwater control systems;

3

- Failure to pay for damage caused to Middlebelt Road (as alleged by Wade Trim in Wade Trim's First Amended Complaint, attached as Exhibit 1);

- Failure to install and perform groundwater control systems in accordance with approved submittals regarding well depth and pump depth;

- Failure to perform pump tests promised by its submittals. *See Cross Claim attached as Exhibit C, at ¶ 19.*

14.     None of the above are derived from any of the terms or conditions in Ric-Man's Contract with OCWRC.

## THE INSURANCE CONTRACT

15.     Pioneer issued the Policy to Ric-Man for coverage of 'claims made' between December 15, 2018 and June 30, 2020. *Exhibit A.*

16.     As relating to this Declaratory Judgment Action, the Policy contains the following terms:

II. A. "The Insurer will defend the Insured, with counsel of our mutual agreement, because of a Professional Claim… "

II. D. "In the event that the Insured is entitled by law and chooses to retain independent counsel of its choosing to defend the Insured at the Insurer's expense, the attorney fee component of Claims Expenses shall be limited to the rates the Insurer actually pays to counsel it retains in the ordinary course of business in the defenses of similar cases in the community where the claim arose or is being defended.

IV. Y. "Professional Claim means any demand, demand for arbitration or mediation or suit received by the Insured seeking Damages or correction of Professional Services and alleging liability or responsibility on the Insured's part or on the part of any entity or person for who the Insured is legally responsible.

IV. Z. "Professional Services means:

2. construction management, program management, project management, owner's representative and any design delegated responsibility or design assist performed by the Insured… "

4

IV. F. "Damages means the monetary amounts for which the Insured may be held liable, including sums paid as judgments, awards, settlements, partial or complete loss, or diminishment of value, and related Claims Expenses, resulting from a Professional Claim."

## DEMAND FOR COVERAGE

17.     On June 17, 2019 Ric-Man's notice of claim for coverage was sent to Pioneer.

18.     The next day, Ric-Man received correspondence from Charles J. Sinclair of Crosswalk Claims Management, LLC ("Crosswalk"), representing that it was an administrator for Pioneer's claims and seeking information required by the Policy in order to conduct an investigation of the claim.

19.     Ric-Man sent the requested information and supporting documents to Mr. Sinclair on August 16, 2016.

20.     Despite several subsequent inquiries by email and voice mail regarding the status of Ric-Man's claim, Mr. Sinclair has failed to respond for almost three months.

21.     On November 8, 2019, Mr. Sinclair finally notified Ric-Man that "the Policy does not appear to be triggered, as Ric-Man was aware of an actual or potential Professional Claim prior to the effective date of the Policy." *See Coverage Position Letter attached as Exhibit D.*

## COUNT I
## DECLARATORY JUDGMENT

22.     Ric-Man hereby incorporates and re-alleges the allegations set forth in paragraphs 1-21 as if fully set forth herein.

23.     There is a genuine and bona fide dispute, and an actual controversy and disagreement between Ric-Man and Pioneer, regarding whether Pioneer has a duty to defend and indemnify Ric-Man against claims asserted in the Lawsuit.

24.     Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Ric-Man in good faith requests that the Court declare that Pioneer has a duty to defend Ric-Man in connection with the claims asserted against Ric-Man by OCWRC in the Lawsuit because OCWRC's factual allegations may eventually obligate Pioneer to indemnify Ric-Man under the coverage provided by the Policy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Ric-Man prays as follows:

1.     For a declaration that Pioneer has a duty to defend Ric-Man in connections with the claims asserted by OCWRC in the Lawsuit; and

2.     For such other and further relief this Court may deem just and proper.

Dated: November 15, 2019                    Respectfully submitted,


*/s/ Mark L. McAlpine*
Mark L. McAlpine (P35583)
Ted Peters (P40220)
**MCALPINE PC**
3201 University Drive Suite 200
Auburn Hills, MI 48326
(248) 373-3700
mlmcalpine@mcalpinepc.com
tpeters@mcalpinepc.com
Attorneys for Plaintiff Ric-Man.

# Exhibit A

# PIONEER
## UNDERWRITERS

**CONTRACTORS POLLUTION & PROFESSIONAL LIABILITY INSURANCE**

**DECLARATIONS**

| | |
|---|---|
| Policy No.: CPP-0000190-01 | Brown & Riding Insurance Services, Inc. |
| Renewal of: N/A | 85 Campau Avenue NW, Suite 310 Grand Rapids, MI 49503 |

---

**Notice: Sections I. Coverages A, B and F of this Policy provide Claims Made and Reported Coverage and Subject to Its Provisions Applies Only to Claims Which are Both First Made by or Against the Insured and Reported to the Insurer During the Policy Period or the Extended Reporting Period, If Applicable. Claim Expense is Included Within the Limit of Liability.**

**Please Read The Entire Policy Carefully.**

---

**A.**  **Named Insured:**  Ric-Man Construction, Inc.

  **Address:**  42600 R. Mancini Drive
  Sterling Heights, MI 48314

**B.**  **Policy Period:**  **Effective date: 12/15/2018**  **Expiration date: 06/30/2020**
  Both dates at 12:01 A.M. (Standard Time) at the address of the Named Insured.

**C.**  **Limits of Liability:**

  1. each Claim  Per PSR-SLC-PCPP-END-08 (06/16) and PSR-PCE-PCPP-END-33 (09/16)
  2. in the Aggregate  Per PSR-SLC-PCPP-END-08 (06/16) and PSR-PCE-PCPP-END-33 (09/16)

  **Supplemental Coverages**

| | | |
|---|---|---|
| 3. Disciplinary Proceedings | $10,000 each Claim / $100,000 in the Aggregate | Premium $21,313.00 |
| 4. Litigation Expense | $500 per day each Claim / $5,000 in the Aggregate | State Tax $532.83 |
| 5. Subpoena Expense | $10,000 each Claim / $100,000 in the Aggregate | Total $21,845.83 |
| 6. ADA & FHA Expense | $10,000 each Claim / $100,000 in the Aggregate | |
| 7. Corporate Reputation | $10,000 each Claim / $100,000 in the Aggregate | |

**D.**  **Self-Insured Retention:**  $25,000

---

**This insurance has been placed with an insurer that is not licensed by the state of Michigan. In case of insolvency, payment of claims may not be guaranteed.**

---

**E.**  **Retroactive Dates:**

| | |
|---|---|
| Coverage A-Protective Errors and Omissions | Per PSR-PCE-PCPP-END-33 (09/16) |
| Coverage B-Professional Liability | 04/15/2011 |
| Coverage C-Contractor's Pollution Liability | N/A - Occurrence |
| Coverage D-Transportation Pollution Liability | N/A - Occurrence |
| Coverage E-Non-Owned Disposal Site | N/A - Occurrence |
| Coverage F-Mitigation of Damages | 06/01/2016 |
| Coverage G-Site Pollution Liability | Location Specific per PSR-IP-PCPP-END-02 (05/16) |

**F.**  **Policy Premium:**  $21,313

  **TRIA Premium:**  $0

  **Total Premium:**  $21,313

---

PSR-N-PCPP-DEC-02 (01/18)  Page 1 of 2

***This insurance has been placed with an insurer that is not licensed by the State of Michigan. In case of insolvency, payment of claims is not guaranteed.***

# PIONEER
## UNDERWRITERS

**G.**     **Endorsements:**

1. Lloyd's Amendatory Wordings
   PSR-LL-EIL-END-01 (01/18) - Lloyd's Syndicate Endorsement
   NMA1256 - Nuclear Incident Exclusion Clause-Liability-Direct (Broad) (U.S.A)
   NMA1477 - Radioactive Contamination Exclusion Clause-Liability-Direct (U.S.A)
   LSW1001 - Several Liability Notice
   NMA0464 - War and Civil War Exclusion Clause
   LMA3100 - Sanction Limitation and Exclusion Clause
   NMA2920 - Terrorism Exclusion Endorsement
   LMA5219 - U.S. Terrorism Risk Insurance Act of 2002 as Amended – Not Purchased Clause
2. PSR-ME-PCPP-END-03 (05/16) - Minimum Earned Premium
3. PSR-SCA-PCPP-END-31 (09/16) - Supplemental Coverages Amendment
4. PSR-SLC-PCPP-END-08 (06/16) - Separate Limit of Liability Per Coverage Part Endorsement
5. PSR-PCE-PCPP-END-33 (09/16) - Policy Change(s) Endorsement
6. PSR-AI-PCPP-END-01 (05/16) - Additional Insured Endorsement
7. PSR-DCK-PCPP-END-17 (06/16) - Deletion of Condition K - Choice of Law and Jurisdiction
8. PSR-SPA-PCPP-END-34 (10/16) - Site Pollution Amendatory
9. PSR-IP-PCPP-END-02 (05/16) - Insured Property Schedule
10. PSR-PNE-PCPP-END-35 (11/16) - Prior Notice Exclusion
11. PSR-ASE-PCPP-MAN-01 (12/18) – Anti-Stacking Endorsement
12. NMA1998 (11/17) - Service of Suit Clause (U.S.A.)

**H.**     **Notification of Claims to:**          Pioneer Underwriters
                                                   48 Wall Street, 17th Floor
                                                   New York, NY 10005
                                                   Email: EILCLAIMS@pioneeruw.com

In accordance with the authorization granted to Pioneer Special Risk Insurance Services, Inc. under Contract No. B131210655U18 by certain Underwriters at Lloyd's, London, whose names and the proportions underwritten by them can be ascertained by reference to the said Contract, which bears the Seal of Lloyd's Policy Signing Office and is on file at the office of the said Agency and in consideration of the premium specified herein, the said Underwriters do hereby bind themselves, each for their own part and not one for another, their heirs, executors and administrators, to insure as follows in accordance with the terms and conditions contained or endorsed hereon.

The Policy terms and conditions contained herein or endorsed hereon and such other provisions, agreements or conditions as may be endorsed hereon or added hereto are hereby incorporated in this Policy No representative of the Underwriters shall have the power to waive or be deemed to have waived any provision or condition of this Policy unless such waiver, if any, shall be written upon or attached hereto; nor shall any privilege or permission affecting the insurance under this Policy exist or be claimed by the Insured(s) unless so written or attached.

*Eugene K Hinman*

Authorized Representative

Eugene K. Hinman
CEO
Pioneer Special Risk Insurance Services, Inc.

# PIONEER
## UNDERWRITERS

**CONTRACTORS PROFESSIONAL AND
POLLUTION LIABILITY INSURANCE
POLICY – OCCURRENCE POLLUTION**

---

**NOTICE:   SECTION I. COVERAGES A, B AND F PROVIDE CLAIMS MADE AND REPORTED
COVERAGE AND SUBJECT TO ITS PROVISIONS APPLIES ONLY TO CLAIMS WHICH ARE BOTH
FIRST MADE BY OR AGAINST THE INSURED AND REPORTED TO THE INSURER DURING THE
POLICY PERIOD OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE.   CLAIM EXPENSE IS
INCLUDED WITHIN THE LIMIT OF LIABILITY.**

**PLEASE READ THE ENTIRE POLICY CAREFULLY.**

---

In consideration of the payment of the premium, and in reliance upon the statements made in the
application, materials, and information provided by the **Insured**, which are incorporated into this Policy,
and form a part hereof, and are representations upon which this Policy has been issued, the **Insurer**
identified in the **Declarations**, herein called the "**Insurer**," agrees as follows:

I.    **INSURING AGREEMENT**

**Coverage A - Protective Errors and Omissions**

The **Insurer** shall indemnify the **Insured** for **Ultimate Loss** established by law or settlement to
which the **Insurer** agrees, in excess of all applicable limits of liability of the **Design
Professional's Insurance,** provided that:

1.   the **Protective Claim** for such **Ultimate Loss** is made during the **Policy Period** and reported
in writing by the **Named Insured** to the **Insurer** during the **Policy Period** or any applicable
**Extended Reporting Period**; and

2.   the **Protective Claim** arises out of the rendering or failure to render **Professional Services**
performed by a **Design Professional** on or after the **Retroactive Date**; and

3.   the **Insured** shall do all that is reasonable and legally permitted to first seek recovery for all
**Ultimate Loss** from the responsible **Design Professional**.

**Coverage B - Professional Liability**

The **Insurer** shall pay on behalf of the **Insured** all sums in excess of the Self-Insured Retention
stated in the **Declarations** which the **Insured** is legally obligated to pay as **Damages** because of
a **Professional Claim** first made against the **Insured** during the **Policy Period** and reported to
the **Insurer**, in writing, during the **Policy Period**, or any applicable **Extended Reporting Period**,
provided that:

1.   the **Professional Claim** arises out of an actual or alleged act, error or omission with respect
to the rendering of or failure to render **Professional Services** by the **Insured** or by a **Design
Professional** for whom the **Insured** is legally responsible; and

2.   the act, error, or omission took place on or after the **Retroactive Date** specified in the
**Declarations** and before the end of the **Policy Period**.

# PIONEER
## UNDERWRITERS

**Coverage C - Contractor's Pollution Liability**

The **Insurer** shall pay on behalf of **Insured** for a **Pollution Loss** in excess of the Self-Insured Retention stated in the **Declarations** which the **Insured** is legally obligated to pay as a result of a **Pollution Claim** from a **Pollution Condition** arising out of **Contractor Activities,** insured herein, provided that:

1. the **Pollution Loss** arises out of actual or alleged **Contractor Activities** rendered or failed to be rendered by either the **Insured,** or others for whom the **Insured** is legally responsible; and

2. the **Bodily Injury**, **Property Damage**, or **Environmental Damage** occurs during the **Policy Period**.

**Coverage D - Transportation Pollution Liability**

The **Insurer** shall pay on behalf of **Insured** for a **Pollution Loss** in excess of the Self-Insured Retention stated in the **Declarations** which the **Insured** is legally obligated to pay as a result of a **Pollution Claim** arising out of **Transportation Activities** provided that the **Bodily Injury**, **Property Damage**, or **Environmental Damage** occurs during the **Policy Period.**

**Coverage E - Non-Owned Disposal Site**

The **Insurer** shall pay on behalf of **Insured** for a **Pollution Loss** in excess of the Self-Insured Retention stated in the **Declarations** which the **Insured** is legally obligated to pay as a result of a **Pollution Claim** from **Pollution Conditions** provided that:

1. the **Pollution Condition** arises from waste material generated by **Contractor Activities**; and

2. the **Pollution Condition** is on, at, under or migrating from a **Non-Owned Disposal Site**; and

3. the **Bodily Injury**, **Property Damage**, or **Environmental Damage** occurs during the **Policy Period.**

**Coverage F - Mitigation of Damages**

The **Insurer** shall indemnify the **Insured** in excess of the Self-Insured Retention stated in the **Declarations** for **Mitigation Costs** incurred by the **Insured** against direct costs and expenses necessarily incurred in respect of any action to mitigate or rectify an act, error, or omission in providing covered **Professional Services** that otherwise would be subject to a **Professional Claim** under this Policy, provided always that:

1. the act, error, or omission took place on or after the **Retroactive Date** specified in the **Declarations** and before the end of the **Policy Period**; and

2. the **Insured** provides prompt and prior written notice to the **Insurer** during the **Policy Period** of the **Insured's** proposed corrective action and presents evidence to the **Insurer** that an eventual **Professional Claim** being made in the absence of the **Insured's** undertaking of mitigation or rectification action is a reasonable probability; and

3. the **Insured** obtains written approval from the **Insurer** prior to incurring any **Mitigation Costs**.

# PIONEER
## UNDERWRITERS

**Coverage G - Site Pollution Liability**

The **Insurer** shall pay on behalf of **Insured** for a **Pollution Loss** in excess of the Self-Insured Retention stated in the **Declarations** which the **Insured** is legally obligated to pay as a result of a **Pollution Claim** resulting from a **Pollution Condition** on, at, under, or migrating from a **Insured Property** provided that:

1. the **Pollution Condition** originates from an **Insured Property**; and

2. the **Pollution Condition** is sudden and accidental and first begins on or after the **Retroactive Date** specified in the Declarations and ends within a period of ten (10) consecutive days from the time it began; and

3. the **Pollution Condition** is first discovered by the **Named Insured** during the **Policy Period** and reported to the Insurer, in writing, during the **Policy Period**, or any applicable **Extended Reporting Period**; or

4. the **Pollution Claim** is first made against the **Named Insured** and reported to the **Insurer**, in writing during the **Policy Period** or any applicable **Extended Reporting Period**.

## II.   DEFENSE AND SETTLEMENT

A. The **Insurer** will defend the **Insured**, with counsel of our mutual agreement, because of a **Professional Claim** or **Pollution Claim**, subject to the applicable Self-Insured Retention and the Limit of Liability stated in the **Declarations**. The **Insurer** shall have the right and duty to defend any **Professional Claim** or **Pollution Claim** made against the **Insured** seeking sums payable under this Policy, even if the allegations of the **Professional Claim** or **Pollution Claim** are groundless or false. The **Insured** shall not assume or admit liability, make any payment, consent to any judgment, settle any **Professional Claim** or **Pollution Claim** or incur any **Claim Expense** without the prior written consent of the **Insurer**, which consent shall not be unreasonably withheld. The **Insurer** shall not be liable for any expense, settlement, assumed obligation or admission to which it has not consented.

B. The **Insurer** has the right to investigate, conduct negotiations concerning, and with the **Insured's** written consent, settle, any **Professional Claim** or **Pollution Claim** as it deems expedient within the Limits of Liability as set forth in the Policy. If the **Insured** refuses to consent to a settlement or compromise recommended by the **Insurer** and acceptable to the claimant, then the **Insurer**'s Limit of Liability under this Policy with respect to such **Professional Claim** or **Pollution Claim** shall be reduced to the amount for which the **Professional Claim** or **Pollution Claim** could have been settled, including all **Claim Expenses** incurred up to the time the **Insurer** made its recommendation to the **Insured**.

C. The **Insurer** shall have no obligation to pay any **Professional Claim** or **Pollution Claim**, including **Claim Expense**, or to defend, continue to defend, or indemnify for any **Ultimate Loss**, **Damage, Mitigation Costs** or **Pollution Loss** after the Limit of Liability has been exhausted by any payment, including **Claim Expenses**, or any deposit or tender of the Limit of Liability into Court.

D. In the event the **Insured** is entitled by law and chooses to retain independent counsel of its choosing to defend the **Insured** at the **Insurer's** expense, the attorney fee component of **Claim Expense** shall be limited to the rates the **Insurer** actually pays to counsel it retains in the ordinary course of business in the defenses of similar claims in the community where the claim arose or is being defended. In addition, the **Insurer** may exercise its right to require that the independent counsel possess certain minimum qualifications which may include that

# PIONEER
## UNDERWRITERS

the selected counsel have (1) at least five years of civil litigation experience, including substantial experience defending the subject at issue in the claim, and (2) errors and omissions coverage which proof of coverage must be provided to the **Insurer** and on a renewable basis and which coverage must be current during the handling of the claim by counsel retained by the **Insured**. At a minimum, the amount of coverage must equal the Limits of Liability of this policy. The **Insured** further agrees to require its independent counsel to provide the **Insurer** with information concerning the claim in a timely manner, and to respond to the **Insurer's** requests for information concerning the claim. The **Insured** may, at any time, freely and fully waive any right to select independent counsel by a signed consent.

## III.   SUPPLEMENTAL COVERAGES

The following Supplemental Coverages are in addition to the each Claim and in the Aggregate Limits of Liability set forth in Item C. of the **Declarations**:

### A.   Claims Expense for Disciplinary Proceedings

Subject to the Disciplinary Proceedings Limit of Liability stated in Item C.3. of the **Declarations**, the **Insurer** shall pay on behalf of the **Insured**, expenses which the **Insured** pays because of a disciplinary proceeding first commenced against the **Insured** during the **Policy Period** for **Professional Services** or **Contractor Activities** rendered by the **Insured** or performed on behalf of the **Insured**.

### B.   Litigation Expense Reimbursement

Subject to the Litigation Expense Limit of Liability stated in Item C.4. of the **Declarations**, the **Insurer** shall reimburse the **Insured's** actual loss of earnings and reasonable expenses incurred when the **Insured** attends a hearing, deposition or trial at the written request of the **Insurer** in the course of defending an otherwise covered **Professional Claim** or **Pollution Claim**.

### C.   Subpoena Expenses Coverage Extension

Subject to the Subpoena Expenses Limit of Liability stated in Item C.5. of the **Declarations**, the **Insurer** shall, at the **Insured's** request, retain counsel and pay such counsel's reasonable and necessary fees and costs to advise the **Insured** regarding the production of documents and/or represent the **Insured** during the preparation and giving of testimony, in response to a subpoena served on the **Insured,** arising from **Professional Services** or a **Pollution Condition**.

### D.   ADA and FHA Expense Reimbursement

Subject to the ADA and FHA Expense Limit of Liability stated in Item C.6. of the **Declarations**, the **Insurer** shall reimburse the **Insured's** attorney's fees and other expenses incurred when the **Insured** responds to regulatory or administrative actions brought against it during the **Policy Period** by a government agency under the Americans with Disabilities Act of 1990 (ADA) or the Fair Housing Act (FHA). The regulatory or administrative action must result from the rendering of or failure to render **Professional Services** by the **Insured**, or by a **Design Professional** for whom the **Insured** is legally responsible, and be reported to the **Insurer** before any attorney's fees or other expenses are incurred.

# PIONEER
## UNDERWRITERS

E.      **Corporate Reputation Rehabilitation**

Subject to the Corporate Reputation Rehabilitation Limit of Liability stated in Item C.7. of the **Declarations**, the **Insurer** shall pay on behalf of the **Insured**, expenses reasonable and necessary to restore corporate reputation that is a result of a covered **Professional Claim** or **Pollution Claim**. The **Insurer** will consult with the **Insured** over the selection of a public relations firm that meets certain minimum certifications and qualifications (i.e. Examination for Accreditation in Public Relations, Accredited Business Communicator form International Association of Business Communicators).

## IV.    DEFINITIONS

Words importing the singular will be construed as importing the plural and vice versa. For purposes of this Policy:

A.      **Bodily Injury** means physical injury, sickness, disease, mental anguish or shock sustained by any person, including death resulting therefrom. Furthermore, **Bodily Injury** shall extend to include the monitoring of medical conditions.

B.      **Claim Expense** means reasonable and necessary fees and costs incurred by the **Insurer** to defend or administer any **Professional Claim** or **Pollution Claim** for which coverage is provided under this Policy. **Claim Expense** includes reasonable and necessary fees for attorneys, investigators, arbitrators, mediators, consultants and expert testimony as well as court and arbitration costs and expenses, but (except as provided in Section III.B. Litigation Expense Reimbursement) shall not include any remuneration, salaries, regular or overtime wages, benefits, or fees of directors, officers, managers and employees of the **Insured** or **Insurer**. **Claim Expense** shall not include fees and expenses of independent adjusters unless such services are provided as part of the defense or administration of any **Professional Claim** or **Pollution Claim**. **Claim Expense** also includes premiums on appeal bonds, attachment bonds or any similar bonds; however, the **Insurer** is not obligated to apply for, secure or furnish any such bond.

C.      **Cleanup Costs** means costs associated with the investigation, monitoring, removal, disposal of soil, surface water, groundwater or other contamination, clean up, abatement, containment, treatment, neutralization, capping, remediation, or correction of a **Pollution Condition** to the extent required by **Environmental Law**. **Cleanup Costs** also includes **Restoration Costs**. In the absence of an applicable law regarding cleanup of mold or legionella pneumophila, necessary **Cleanup Costs** may be established by obtaining the written recommendations of a Certified Industrial Hygienist retained with the prior approval of the Insurer. **Cleanup Costs** also means **Emergency Expense**.

D.      **Completed Operations** means work from **Contractor Activities** that has been completed, including materials, parts, or equipment furnished in connection with such work or operations, and that results in a **Pollution Claim** or **Pollution Loss**.

E..     **Contractor Activities** mean:

1.      any general construction or management activity performed by an **Insured**, including similar activity by an entity for whom the **Insured** is legally responsible, which results in a **Pollution Condition**; or

# PIONEER
## UNDERWRITERS

    2.    any environmental activity performed by an **Insured**, including similar activity by an entity for whom the **Insured** is legally responsible, which results in a **Pollution Condition**.

**Contractor Activities** also includes **Completed Operations**.

**F.**    **Damages** means the monetary amounts for which the **Insured** may be held legally liable, including sums paid as judgments, awards, settlements, partial or complete loss, or diminishment of value, and related **Claim Expense**, resulting from a **Professional Claim**. **Damages** also include liquidated damages, but only to the extent of liability the **Insured** would have had in the absence of an agreement for liquidated damages.

    **Damages** does not include the restitution, return, withdrawal or reduction of fees, profits or charges for services rendered or offered, or any other consideration or expenses paid to the **Insured** or by the **Insured** for services or products; any equitable obligation, including restitution, disgorgement, or the cost of complying with injunctive relief; or (except as provided in Section III.B. Litigation Expense Reimbursement) the time and expense incurred by an **Insured** in addressing or resolving a claim.

**G.**    **Declaration** means the **Declarations Page** to this policy noting the Limits, Self-Insured Retentions, **Named Insured**, and other items as applicable that are part of this insurance.

**H.**    **Design Professional** means those persons or entities or successors professionally qualified to perform **Professional Services.**

**I.**    **Design Professional's Insurance** means all available professional liability insurance policies where the **Design Professional** is an Insured, including any respective sub consultant.

**J.**    **Emergency Expense** means reasonable and necessary expense, incurred by the **Named Insured**, on an emergency basis to contain, control, mitigate or rectify a **Pollution Condition** that is an imminent and substantial endangerment to public health, safety, welfare, or to the environment, provided that such expense is reported to the Insurer within five (5) days of the discovery of the **Pollution Condition.**

**K.**    **Environmental Damage** means physical injury to soil, surface water, groundwater or the atmosphere that results in **Cleanup Costs.**

**L.**    **Environmental Law** means any federal, state, provincial, or other local laws, statutes, ordinances, regulations, including any legally executed state voluntary cleanup or risk-based corrective action programs, governing the cleanup of a **Pollution Condition.**

**M.**    **Extended Reporting Period** means the Automatic Extended Reporting Period or, if applicable, the Optional Extended Reporting Period described in Section IX. of this Policy**.**

**N.**    **Insured** means:

    1.    the **Named Insured**; or

    2.    any and all affiliates, divisions, subsidiary corporations, or subsidiary limited liability companies thereof of the **Named Insured**, of any tier, in the past, as now or hereinafter constituted; or

    3.    any present or former partner, director, officer, manager**,** member, trustee, or employee of the **Named Insured** solely while acting on behalf of the **Named Insured**; or

# PIONEER
## UNDERWRITERS

4. any **Insured** with regard to its participation in a legal entity including a joint venture, but solely for the **Insured's** legal liability for its performance of **Professional Services** or **Contractor Activities** under the respective legal entity or joint venture. **Insured** does not include the legal entity itself, the joint venture itself or any other entity that is part of either the legal entity or joint venture, except as respects liability assumed by the **Insured** for a **Pollution Condition**; or

5. with regard to Coverage C (Contractor's Pollution Liability) only, any client of the **Named Insured**, or any entity or person that requires the **Named Insured** to name them as an additional insured on this policy as required by contract, agreement, or permit, but solely as respects covered **Pollution Loss** caused by the **Named Insured's Contractor Activities**; or

6. any entity which is specifically referenced as an insured in the **Declarations** or by endorsement as an **Insured**;

7. the estate, heirs, executors, shareholders, administrators or legal representatives of an **Insured** in the event of such **Insured's** death, incapacity or bankruptcy but only to the extent such **Insured** would otherwise be provided coverage under this Policy while solely acting on behalf of the **Named Insured**; or

8. any prior entity that has been reported to the **Insurer** and whose assets, partners, principals, or shareholders were acquired by the **Named Insured**, for which the **Named Insured** is responsible for the prior entity's insurance; or

9. any entity newly formed or acquired by the **Named Insured** during the **Policy Period** in which the **Named Insured** has more than 50% legal or beneficial interest and over which the **Named Insured** exercises management or financial control and has financially agreed to provide insurance for such entity.  However:

 a. Coverage will only be provided for claims arising out Professional Services or Contractor Activities performed on or after the date of formation,  acquisition, or exercised financial or management control; and

 b. This coverage will expire within 90 days of such formation or acquisition or the end of the Policy Period, whichever is earlier, unless the Named Insured provides written details of such newly formed or acquired entity to the Insurer and pays the additional premium requested by the Insurer, if any.

**O.** **Insured Property** means real property owned, leased, rented or occupied by the **Insured** as scheduled by endorsement to this policy.

**P.** Solely with respect to Coverage C - Contractor's Pollution Liability, **Insured Contract** means:

1. a contract for a lease of premises. However, that portion of the contract for a lease of premises in excess of 30 consecutive days that indemnifies any person or organization for damage by fire, lightning, or explosion to premises while rented to the **Insured** or temporarily occupied by the **Insured** with permission of the owner is not an **Insured Contract**; or

2. a sidetrack agreement; or

# PIONEER
## UNDERWRITERS

3.    any easement or license agreement: or

4.    an obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality; or

5.    an elevator maintenance agreement; or

6.    that part of any other contract or agreement pertaining to the **Insured's** business (including an indemnification of a municipality in connection with work performed for a municipality) under which the **Insured** assumes the tort liability of another party to pay for **Bodily Injury**, **Property Damage**, or **Environmental Damage** to a third party or organization. This section does not include that part of any contract or agreement that indemnifies an architect, engineer, or surveyor for injury or damage arising out of:

    a.  Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or

    b.  Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage.

For the purpose of this section, tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

**Q.**    **Mitigation Costs** mean direct costs and expenses necessarily incurred in respect of any action to mitigate or rectify an act, error, omission, or activity that otherwise would be subject to a **Professional Claim** under this policy.

**Mitigation Costs** do not include any costs or expenses to redo, modify, supplement or fix the **Insured's** work or that are a betterment or of a consequential nature, including but not limited to: project delays, cost overruns, increase in funding costs or any loss of use of any project.

Furthermore, **Mitigation Costs** do not include costs or expenses in connection with the **Insured's** own profit, overhead or salaries.

**R.**    **Named Insured** means the individual, partnership, entity, firm, or the company named in Item A of the **Declarations.**

**S.**    **Natural Resource Damage** means the actual or assessed physical injury to or destruction of, including the resulting loss of value, to land, fish, wildlife, air, water, drinking water supplies and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by any Local, State, Provincial or foreign government, the United States (includes resources of any fishery conservation zone established by the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et. Seq.)), any Native American tribe or, if such resources are subject to a trust restriction or alienation, any member of a Native American tribe.

**T.**    **Non-Owned Disposal Site** means a location used for the treatment, storage, or disposal of an **Insured's** waste material provided that:

1.    the location(s) is (are) not managed, operated, owned or leased by the **Insured** or any subsidiary or affiliate of the **Insured**; and

# PIONEER
## UNDERWRITERS

    2.    the location(s) is (are) permitted and/or licensed by and Federal, State, Local or Provincial authorities to accept such material as of the date of the treatment, storage or disposal.

**U.**    **Policy Period** means the period from 12:01 a.m. on the effective date of this policy to 12:01 a.m. on the expiration date of this policy as set forth in Item B of the **Declarations** or earlier termination date if this policy is cancelled.

**V.**    **Pollution Claim** means the assertion of a legal right alleging liability or responsibility on the part of the **Insured**, arising out of a **Pollution Condition**, and shall include but not necessarily be limited to lawsuits, petitions, arbitrations or other alternative dispute resolutions, and public agency directives, made against the **Insured**.

**W.**    **Pollution Condition** means the actual or alleged discharge, dispersal, release, seepage, migration, growth, or escape of silt, sediment, smoke, soot, fumes, acids, alkalis, toxic chemicals, mold, mildew, spores, fungi, bacteria, legionella pneumophila, asbestos, lead, silica, liquids or gases, waste materials, contaminants, electromagnetic fields, hazardous substances, hazardous materials, waste materials including medical, infectious, and pathological wastes, or other irritants, into or upon land, any structure on land, the atmosphere contained within that structure or any watercourse or body of water, including groundwater. Radioactive matter shall also be considered a pollutant, except as otherwise covered or protected by insurance or protections provided pursuant to 42 U.S.C. § 2014(w), as amended, or Section 170 of the Atomic Energy Act of 1954, as amended.

**X.**    **Pollution Loss** means the amount the **Named Insured** is legally obligated to pay, including **Bodily Injury**, **Property Damage** or **Cleanup Costs**, and related **Claim Expense**, caused by a **Pollution Condition**. Such **Pollution Loss** must result from a **Pollution Condition.**

**Y.**    **Professional Claim** means any demand, demand for arbitration or mediation or suit received by an **Insured** seeking **Damages** or correction of **Professional Services** and alleging liability or responsibility on the **Insured's** part or on the part of any entity or person for whom the **Insured** is legally responsible.

**Z.**    **Professional Services** means:

    1.    environmental consulting, environmental engineering, environmental site assessment, remedial investigation, feasibility studies, environmental monitoring, testing and sampling, remedial oversight and management, ecological studies, industrial hygiene, environmental training, forensic inspection, expert witness, or

    2.    construction management, program management, project management, owner's representation and any design delegated responsibility or design assist performed by the **Insured**, including but not limited to constructability reviews or value engineering**,** or

    3.    architecture, engineering, or contract administration as part of design, sprinkler design, fire protection design, life safety design, mechanical, electrical or security systems design, light use, acoustical or signage design, landscape design, surveying, quantity surveying, material testing, economic, feasibility, technical consulting or studies, software design for the purpose of operating or maintaining any building system, interior design or space planning services, or design services to support Leadership in Energy and Environmental Design (LEED) certification for a project, or

# PIONEER
## UNDERWRITERS

4.      professional services in connection with modification or alteration, transfer, protection, manipulation, use or misuse of any Building Information Modeling (BIM) design assist system or program, or

5.      ordinary technology services  performed in the course of **Professional Services** described above.  Such technology services include the design, development, programming, analysis, training, use, hosting, management, support and maintenance of any software, database, internet service, or website.

**Professional Services** shall not include any activity in connection with construction means, methods or techniques; site safety; crane erection, use, maintenance or operation; scaffolding; any temporary structure; or project fencing.

AA.     **Property Damage** means:

1.      physical injury to or destruction of tangible property including resulting loss of use thereof; or

2.      loss of use of tangible property that has not been physically injured or destroyed; or

3.      diminution of third party property value, which is caused by a **Pollution Condition** arising out of the performance of **Contractor Activities**; or

4.      **Natural Resource Damage**, which is caused by a **Pollution Condition**, arising out of the performance of **Contractor Activities**.

BB.     **Protective Claim** means:  a written demand, demand for arbitration or mediation or a suit instituted by the **Insured** against the **Design Professional** seeking a remedy and alleging liability or responsibility on the part of such **Design Professional** arising from an act, error or omission in the performance or failure to render services.  **Protective Claim** does not include a demand or proceeding for non-monetary or injunctive relief.

CC.     **Responsible Person** means any principal, officer, director, partner, property manager, risk manager or other employee responsible for environmental affairs of the **Insured.**

DD.     **Restoration Costs** means the reasonable and necessary costs incurred by the **Insured** with the **Insurer's** written consent, which consent shall not be reasonably withheld or delayed, to repair, replace, or restore real or personal property by substantially the same condition it was prior to being damaged during work performed in the course of incurring **Cleanup Costs**.  **Restoration Costs** do not include costs associated with improvements or betterments.

EE.     **Retroactive Date(s)** means the date(s) set forth in Item E. of the **Declarations** and from which coverage as provided herein first begins.

FF.     **Transportation Activities** mean:

1.      any loading, unloading, or transportation of goods, materials, products, or waste to or from any site where **Contractor Activities** are performed by an **Insured** including similar activity by an entity for whom the **Insured** is legally responsible, and results in a **Pollution Condition**, but only to the extent the **Insured** is properly licensed and in the business of loading, unloading, or transporting goods, materials, products, waste; or

PSR-N-PCPP-POL-02 (11/16)                                                    Page 10 of 20

# PIONEER
## UNDERWRITERS

> 2. any operation, use, ownership, or maintenance of a land motor vehicle, off-road motor vehicle, mobile equipment, trailer, semi-trailer, watercraft, aircraft, or rolling stock on any site where **Contractor Activities** are performed by an **Insured** including similar activity by any entity for whom the **Insured** is legally responsible, resulting in a **Pollution Condition**;

**GG.** **Ultimate Loss** means the amount the Insured is legally entitled to recover from each responsible **Design Professional** either by final adjudication by a court of competent jurisdiction, settlement, arbitration or any other method of dispute resolution to which the **Insurer** agrees in writing. Such **Ultimate Loss** must be the result of an act, error or omission on the part of a **Design Professional**. In the event that multiple **Design Professionals** cause the same or related loss, the amount of **Ultimate Loss** shall not exceed the single loss caused by such multiple **Design Professionals**.

**HH.** **Underground Storage Tank** means any tank that has at least ten (10) percent of its volume below ground, in existence at the Inception Date, or installed thereafter, including associated underground piping connected to the tank.

## V. EXCLUSIONS

This policy does not apply and the **Insurer** will not be liable to make payments or indemnify any **Insured** for **Ultimate Loss**, **Damages**, **Mitigation Costs** or, a **Pollution Loss**, or a **Protective Claim**, or a **Professional Claim**, or a **Pollution Claim**, or **Claim Expense** directly or indirectly arising out of:

**A.** **Protective Claim Legal Fees**
attorney's fees and any other costs and expenses incurred by any **Insured** in connection with the making and prosecution of a **Protective Claim**;

**B.** **Protective Claim**
the amount of any default judgment, arbitration award or adjudicator's decision in circumstances where the **Design Professional** has failed to plead and/or provide a defense, response or answer, or take any other procedural step, except that this exclusion shall not apply to the amount of **Ultimate Loss** which the **Insured** would have been entitled to recover from the **Design Professional** had such defense, response or answer been pleaded and/or provided, or procedural step been taken;

In such instance where the **Design Professional** has failed to plead and/or provide a defense, response or answer, or take any other procedural step, the burden of proving the extent of **Ultimate Loss** which the **Insured** would have been entitled to recover from the **Design Professional** will be upon the **Insured**;

**C.** **Protective Loss Consent**
a settlement that has been reached with the **Design Professional** involving the limits of liability of this policy without the express written consent of the **Insurer**, such consent not to be unreasonably withheld or delayed;

**D.** **Products**
any design or manufacture of any goods or products which are sold or supplied by the **Insured** or by anyone under license by any **Insured**;

**E.** **Separately Insured Projects**
any project that is insured under a project specific insurance policy, provided, however, that this exclusion shall not apply where your liability is found to be in excess of the limit

# PIONEER
## UNDERWRITERS

of liability available under such project specific professional and/or pollution insurance policy as applicable;

**F.    Faulty Workmanship/Own Work**
the cost to repair or replace faulty workmanship in any construction, erection, fabrication, installation, assembly or manufacturing process performed or provided by any **Insured** or anyone for whom any **Insured** is legally responsible, including materials, parts or equipment furnished in connection therewith, but this exclusion does not apply to liability arising from services of a **Design Professional** or **Contractor Activities** that result in a **Pollution Condition**;

**G.    Discrimination**
any actual or alleged refusal to employ, termination of employment, harassment, humiliation or discrimination on any basis, or other employment related practices or policies.  This exclusion applies whether the **Insured** may be held liable as an employer or in any other capacity.  This exclusion shall not apply as respects the providing of **Professional Services** by the **Insured** or anyone for whom the **Insured** is legally liable in connection with the pre-qualification of firms on behalf of a client;

**H.    Employer's Liability/Workers' Compensation**
any obligation for which any **Insured** or any party shall be liable under any worker's compensation, unemployment compensation, employer's liability, disability benefits law or under any similar law; except this exclusion shall not apply to a third party action over against the **Insured** arising from a **Bodily Injury** due to a **Pollution Claim;**

**I.    Known Condition(s)/Prior Notice**

1.    any claim or circumstance reported under any prior policy; or

2.    any act, error, omission, or circumstance occurring prior to the inception date of this Policy that was known or reported to a **Responsible Person** who could have reasonably foreseen that a claim or mitigation effort could result; or

3.    any **Pollution Condition** existing prior to the inception date of this Policy, and reported to a **Responsible Person** , provided such **Pollution Conditions** were caused by operations performed by or on behalf of the **Insured**.  This exclusion shall apply to any claim, suit, demand, notice or governmental order or directive seeking **Damages** or any other remedy of any kind, including, but not limited to money, repairs, remediation for **Pollution Conditions,** and prohibits any defense of the **Insured** where the **Insured** knew or should have reasonably known of the **Pollution Conditions**, injury or **Damages** prior to the effective date of this Policy;

**J.    Contractual Liability**
liability assumed by any **Insured,** or any entity or person for whom the **Insured** is legally responsible, under any contract or agreement, unless such liability would have attached by law in the absence of such contract or agreement.  This exclusion shall not apply to an **Insured Contract**, nor shall this exclusion apply to liability arising out of **Pollution Conditions**;

**K.    Express Warranties / Guarantees**
express warranties or guarantees unless liability would have attached by law to the **Insured** in the absence of such warranty or guarantee;

**L.    Intentional Acts**

# PIONEER
## UNDERWRITERS

any dishonest, fraudulent, criminal, intentional or malicious act, error or omission or those of a knowingly wrongful nature, except that this exclusion shall not apply to an **Insured** who did not commit, participate in, or have knowledge of such conduct;

**M.**   **Criminal Fines, Penalties and Assessments**
criminal fines, criminal penalties or criminal assessments, punitive, exemplary or the multiple portion of multiplied **Damages**, **Pollution Loss**, or **Ultimate Loss**. However, this exclusion shall not apply if **Damages**, **Pollution Loss**, or **Ultimate Loss** are otherwise covered under this policy and where permitted by law;

**N.**   **Other Business**
any conduct by an individual, corporation, partnership or joint venture of which the **Insured** is a partner, director, officer, member, participant or employee, that is not designated in the **Declarations** or by endorsement as an **Insured**, except that this exclusion shall not apply to the **Insured's** legal liability for its performance of **Professional Services** or **Contractor Activities** under the respective corporation, partnership or joint venture;

**O.**   **Insured vs. Insured**
Claims made by any **Insured** against any other **Insured**. However, this exclusion shall not apply as respects any client of the **Named Insured**, or any entity or person that requires the **Named Insured** to name them as an additional **Insured** on this policy as required by contract, but solely in respect to coverage provided under Coverage C-Contractor's Pollution Liability;

**P.**   **Related Entities**

Claims made by any individual or entity or its subrogees or assignees:

1.   that wholly or partially owns or operates the **Insured**; or

2.   in which the **Insured** has an ownership interest in excess of twenty-five percent (25%); or

3.   that is controlled or operated by the **Insured**; or

4.   in which the **Insured** is an officer or director;

**Q.**   **Hostile Acts**
any **Damages**, **Pollution Loss**, or **Ultimate Loss** caused by or resulting from war, invasion, hostilities, acts of foreign enemies, civil war, rebellion, insurrection, military or usurped power, martial law, or confiscation by order of any government or public authority;

**R.**   **Lead Based Paint and Asbestos**
**Cleanup costs** associated with lead based paint, asbestos, or asbestos containing materials, in, on, or applied to any structure.  This exclusion applies solely to coverage provided under Coverage G;

**S.**   **Underground Storage Tank(s)**
**Pollution Conditions** resulting from an **Underground Storage Tank** on an **Insured Property(s)** whose existence was known by the **Insured** prior to the policy inception date.  This exclusion does not apply to **Underground Storage Tanks:**

# PIONEER
## UNDERWRITERS

1.  either closed, abandoned-in-place or removed prior to the inception date of this policy, in accordance with all applicable Federal, State, or Provincial Regulations in effect at the time of closure, abandonment or removal; or

2.  endorsed to this Policy; or

3.  the existence of which is unknown by the **Insured** prior to the policy inception date; or

4.  that are flow-through process tanks such as oil/water separators, septic tanks and storm water and wastewater collection tanks, including tanks on or above the floor of underground areas;

**T.**   **Divested Property New Pollution Conditions**
**Pollution Conditions** that begin after your **Insured Property(s)** has been sold, given away or abandoned;

**U.**   **Material Change in Use**
based upon or arising out of a change in use of or operations at a **Insured Property** from the use of operations as of the date the **Insured Property** became insured by this Policy, if that change materially increases the likelihood or severity of a **Pollution Condition** or **Pollution Loss.**

## VI.   LIMIT OF LIABILITY, DEDUCTIBLE, AND SELF-INSURED RETENTION

**A.**   **Limit of Liability**

1.  Limit of Liability Each Claim:

    The Limit of Liability of the **Insurer** for all **Ultimate Loss, Damages, Mitigation Costs, or Pollution Loss** including **Claims Expense**, or any other coverages afforded in this Policy or endorsements attached thereto, arising out the same or related negligent act, error, omission, incident and/or **Pollution Condition**, shall not exceed the amount stated in Item C.1. of the **Declarations** for each **Claim.**

2.  Limit of Liability in the Aggregate for the Policy Period:
    The Limit of Liability of the **Insurer** for all **Ultimate Loss, Damages,** or **Mitigation Costs, Pollution Loss,** including **Claim Expense**, or any other coverages afforded in this Policy or endorsements attached thereto, shall not exceed the amount stated in Item C.2. of the **Declarations** as the Aggregate for the **Policy Period**.

3.  Disciplinary Proceedings Limit of Liability: The Disciplinary Proceedings Limit of Liability set forth in Item C.3. of the **Declarations** is the maximum amount payable under the supplemental coverage provided at Section III.A. of the Policy regardless of the number of **Disciplinary Proceedings** initiated against **Insureds** during the **Policy Period** or the number of **Insureds** involved in such proceedings.

4.  Litigation Expense Limit of Liability: The Litigation Expense Limit of Liability set forth in Item C.4. of the **Declarations** is the maximum amount payable in the aggregate for all **Insureds** under the supplemental coverage provided at Section III.B. of the Policy.

# PIONEER
## UNDERWRITERS

5.  <u>Subpoena Expenses Limit of Liability</u>: The Subpoena Expenses Limit of Liability set forth in Item C.5. of the **Declarations** is the maximum amount payable under the supplemental coverage provided at Section III.C. of the Policy regardless of the number of subpoenas served on **Insureds** during the **Policy Period** or the number of **Insureds** subject to subpoenas.

6.  <u>ADA and FHA Expenses Limit of Liability</u>: The ADA and FHA Expenses Limit of Liability set forth in Item C.6. of the **Declarations** is the maximum amount payable under the Supplemental Coverage provided in Section III.D. of the Policy regardless of the number of regulatory or administrative actions initiated against the **Insureds** during the **Policy Period** or the number of **Insureds** involved in such regulatory or administrative actions.

7.  <u>Corporate Reputation Rehabilitation</u>: The Corporate Reputation Rehabilitation Limit of Liability set forth in Item C.7. of the **Declarations** is the maximum amount payable under the supplemental coverage provided at Section III.E of the Policy regardless of the number of reputation rehabilitation efforts made by the **Insureds** during the **Policy Period**.

**B.   Self-Insured Retention**

The Self-Insured Retention amount stated in Item D. of the **Declarations** is applicable to each claim and applies to the payment of **Mitigation Costs, Professional Claims** or **Pollution Claims**, including **Claim Expense**. The Self-Insured Retention amount shall be paid by the **Named Insured** and shall be uninsured and remain uninsured during the **Policy Period** and any applicable **Extended Reporting Period**. The Limits of Liability set forth in Items C. of the **Declarations** are in addition to and in excess of the Self-Insured Retention amount. No Self-Insured Retention amount shall apply with respect to the supplemental coverages provided pursuant to Section C of the Policy except as respects Mitigation of Damages or Pollution Loss.

Mediation Credit:  If the **Insurer** and the **Insured** agree beforehand to attempt to resolve a claim at mediation**,** and if the **Insurer** and the **Insured** resolve such claim by such mediation, the **Named Insured's** Self-Insured Retention obligation for such claim will be reduced by 50% subject to a maximum reduction of $25,000.  Herein, mediation shall mean the non-binding facilitation in claim resolution by a neutral third party.

## VII.   MULTIPLE INSUREDS

The number of **Insureds** covered by this policy shall not operate to increase the Limits of Liability specified in the **Declarations**.

## VIII.   MULTIPLE CLAIMS

Two or more **Protective Claims, Professional Claims, Pollution Claims, or Mitigation Costs** arising out of a single act, error, omission, incident or **Pollution Condition**, or arising out of a series of acts, errors, omissions or incidents related to each other, will be considered a single claim subject to a single Each Claim Limit of Liability and one Self-Insured Retention, and shall not operate to increase the **Insurer's** Limits of Liability. All such claims, whenever made, shall be considered first made during the **Policy Period** as of the date the earliest claim was first made.

## IX.   EXTENDED REPORTING PERIOD

# PIONEER
## U N D E R W R I T E R S

A.   **Automatic Extended Reporting Period**

If the **Insurer** or **Insured** terminate or non-renew this insurance for any reason, other than nonpayment of premium or the **Insured**'s failure to comply with any term or condition, or fraud or material misrepresentation, the **Insured** shall be entitled to a period of sixty (60) days from the date of policy termination to report **Protective Claims, Professional Claims,** and/or **Mitigation Costs** which are made by or against the **Insured** prior to such termination date. This Automatic Extended Reporting Period may not be canceled by the **Insurer** and does not require the payment of an additional premium.   This Automatic Extended Reporting Period shall be included within the Optional Extended Reporting Period if such is purchased.

B.   **Optional Extended Reporting Period**

If the **Insurer** or **Insured** terminate or non-renew this insurance for any reason, other than nonpayment of premium or your failure to comply with any term or condition, or fraud or material misrepresentation, upon the payment of an additional premium, the **Named Insured** shall have the option to extend the period by which a **Protective Claim, Professional Claim,** and/or **Mitigation Cost** can be made by or against the **Insured** and reported to the **Insurer** provided that the **Ultimate Loss**, or **Professional Service** took place on or after the **Retroactive Date** and before the end of the **Policy Period**.

The premium for the Optional Extended Reporting Period shall be determined by charging (1) 100% of the annual premium for twelve (12) months, (2) 150% for twenty-four (24) months, or (3) 200% for thirty-six (36) months.  The purchase of an Optional Extended Reporting Period shall be endorsed herein.

The **Named Insured's** right to purchase the Optional Extended Reporting Period must be exercised by notice in writing not later than thirty (30) days after the cancellation or termination date of this policy.  Effective notice must indicate the total Optional Extended Reporting Period desired and must include payment of premium for such period.  If such notice and the premium are not mailed to us within such thirty (30) days, then the **Insured** shall not at a later date be entitled to purchase an Optional Extended Reporting Period.

At the commencement of any Optional Extended Reporting Period, the entire premium shall be deemed fully earned, and in the event the **Insured** terminates the Optional Extended Reporting Period before its term for any reason, the **Insurer** shall not be obligated to return any portion of the premium.

The fact that the period during which **Protective Claim**, **Professional Claim,** and/or **Mitigation Cost** can be reported to the **Insurer** is extended by virtue of the Automatic Extended Reporting Period or Optional Extended Reporting Period shall not in any way increase the Limits of Liability of this Policy.

X.   **CONDITIONS**

A.   **Notice of Claims and Cooperation**

1.   The **Insured** shall, as a condition precedent to the availability of rights provided under this Policy, give written notice to the **Insurer** as soon as practicable during the **Policy Period**, or any applicable **Extended Reporting Period**, of any **Protective Claim, Professional Claim, Mitigation Cost, or Pollution Claim** made by or against the **Insured** or a **Pollution Condition** discovered by the **Insured.**

# PIONEER
## U N D E R W R I T E R S

2. The **Insured** shall furnish the **Insurer** in a reasonable period of time with copies of demands, reports, investigations, pleadings and related papers, and provide other such information, assistance and cooperation as the **Insurer** may reasonably request in the investigation, settlement of a claim or defense of a claim.

3. The **Insured** shall further cooperate with the **Insurer** and do whatever is necessary to secure and effectuate any rights of indemnity, contribution or apportionment that the **Insured** may have.

4. All written notices provided for in this Policy shall be in writing and provided to the **Insurer** on the **Declarations**.

**B.     Notice of Circumstance**

The **Insured** will be deemed to have first given notice of any **Professional Claim or Pollution Claim** to the **Insurer** on the date on which it advises the **Insurer** in writing of any one or more of the following:

1. a **Pollution Condition** which the **Insured** expects could reasonably give rise to a **Pollution Claim**; or

2. an act, error or omission which might reasonably give rise to a **Professional Claim**; or

3. the **Damages** or **Pollution Losses** that have resulted or may result from such an act, error or omission or **Pollution Condition**.

The **Insurer** may investigate any circumstance reported by the **Insured**. Any costs incurred by the **Insurer** in investigating such a circumstance before a **Professional Claim** or **Pollution Claim** is made will be for the **Insurer's** account only and will not reduce the Limit of Liability.

**C.     Territory**

This Policy applies to **Ultimate Loss**, **Damages Mitigation Costs** or a **Pollution Loss** anywhere in the world provided the claim is made by or against the **Insured** in the United States of America, its territories or possessions.

**D.     Audit and Inspection**

The **Insurer** shall be permitted upon reasonable prior notice to audit the **Insured's** final books and records at any time during the **Policy Period** and within three years after the final termination of this policy, as far as they relate to the subject matter of this policy. The **Insurer** shall also be permitted upon reasonable prior notice to inspect, sample and monitor on a continuing basis the **Insured's** operations. Neither our right to make inspections, sample and monitor nor the actual undertaking thereof nor any report thereon shall constitute an undertaking, on behalf of the **Insurer** or others, to determine or warrant that operations are safe, healthful or conform to acceptable engineering practice or are in compliance with any law, rule or regulation.

**E.     Subrogation**

In the event of any payment under this Policy, the **Insurer** shall be subrogated to all the **Insured's** rights of recovery thereof and the **Insured** shall execute and deliver all

# PIONEER
## UNDERWRITERS

instruments and papers and do whatever else is necessary to secure such rights. The **Insured** shall do nothing to waive or prejudice such rights. Any amounts recovered in excess of the **Insurer's** total payment shall be paid to the **Insureds**, less the cost to the **Insurer** of recovery. Furthermore, the Limit of Liability shall be reinstated by the amount of those amounts recovered by the **Insurer** in excess of the **Insurer's** total payment, less the cost to the **Insurer** of recovery. However, it is agreed that the **Insurer** waives its rights of subrogation under this Policy against clients of the **Named Insured** to the extent the client's written contract with the **Named Insured** requires such a waiver of subrogation, but only to the extent required by such contract.

**F.     Changes**

Notices to any agent or knowledge possessed by any agent shall not effect a waiver or a change in any part of this Policy or prevent the **Insurer** from asserting any rights under the terms of this Policy, nor shall the terms of this Policy be waived or changed, unless endorsed hereon.

**G.     Assignment of Interest**

It is agreed that the insurance provided herein cannot be transferred or assigned to another party without the express written consent of the **Insurer**, such consent not to be unreasonably withheld or delayed.

**H.     Cancellation and Termination**

1.  This policy may only be cancelled by the **Insurer** for one or more of the following reasons:

    a.   non-payment of premium;

    b.   a material misrepresentation or concealment of facts;

    c.   a material breach of any provision of this policy.

    If this policy is cancelled by the **Insurer**, notice of cancellation will be sent in writing to the **Named Insured**, at the address indicated on the **Declarations**. The **Insurer** will provide such written notice at least ninety (90) days prior to the date such cancellation is to take effect.   In the event of cancellation for non-payment of premium, the **Insurer** will provide fifteen (15) days written notice.

    The effective date and hour of cancellation will be stated in such notice.  Cancellation by the **Insurer** also cancels the Automatic Extended Reporting Period and Extended Reporting Period.  Both the **Policy Period** and the Automatic Extended Reporting Period and Extended Reporting Period will end on that date.  If the **Insurer** cancels for the reason specified in subparagraph a. there shall be no return premium.  If the **Insurer** cancels for reasons stated in subparagraphs b. or c., the earned premium shall be computed pro-rata of the policy term premium.  Payment of any return premium shall not be a condition of cancellation.

2.  This policy may be cancelled by the **Named Insured** for any reason. In the event that the **Named Insured** cancels the policy, the earned premium shall be computed short-rate of the policy term premium.

**I.     Action Against the Insurer**

# PIONEER
## UNDERWRITERS

No action shall lie against the **Insurer** under Coverages B and C, unless, as a condition precedent thereto, there shall have been full compliance with all of the terms and conditions of this Policy, and both the **Insured's** liability and the amount of the **Insured's** obligations to pay have been finally determined either by final judgment against the **Insured** after an actual trial, or arbitration, or by the **Insured's** written agreement with the claimant or the claimant's legal representative with the **Insurer's** written approval.

No action shall lie against the **Insurer** under Coverage A, unless, as a condition precedent thereto, there shall have been full compliance with all of the terms and conditions of this Policy, and both the **Design Professional's** liability and the amount of the **Design Professional's** obligations to pay have been finally determined either by final adjudication by a court of competent jurisdiction, settlement, arbitration or any other method of dispute resolution to which the **Insurer** agrees in writing.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the **Insurer** as a party to any action against an **Insured** to determine the **Insured's** liability, nor shall the **Insurer** be impleaded by an **Insured** or its legal representative.

No person or organization has a right under this policy to bring the **Insurer** into an action to determine its liability or the **Insured's** liability.

J.   **No Limitation of Liability**

Under Coverage A only, the **Insured** shall not limit the liability of any **Design Professional**, except to insurance proceeds, without the express written approval of the **Insurer.**

K.   **Choice of Law and Jurisdiction**

The policy shall be subject interpretation under the law of the State of New York.

L.   **Bankruptcy of the Insured**

The **Named Insured's** bankruptcy or insolvency shall not relieve the **Insurer** of its obligations under this Policy.

M.   **Authorization Clause**

By acceptance of this Policy, the **Named Insured** shall act of behalf of the **Insureds** for all purposes, including but not limited to the payment or return of premium, receipt and acceptance of any endorsement issued to form a part of this Policy and giving and receiving notice of cancellation, termination or nonrenewal.

N.   **Service of Suit**

In the event of failure of the **Insurer** to pay the amount claimed to be due hereunder, the **Insurer**, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver of the **Insurer's** rights to commence an action in any court of competent jurisdiction in the United States or to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such action may be made upon General Counsel; Law Department: and that in any such action instituted against the **Insurer** relating to this Policy, the **Insurer** will abide by the

# PIONEER
## UNDERWRITERS

final non-appealable decision of such court or of any appellate court in the event of any appeal.

**O.**   **Severability of Insureds**

Except with respect to the Limits of Liability and Self-Insured Retentions, and Section X paragraph M (Authorization Clause), this insurance applies as if each **Insured** were the only **Insured** and separately to each **Insured** against whom a **Protective Claim, Professional Claim or Pollution Claim** is made.

**P.**   **Severability of Policy Provisions**

If any material provision or clause of this Policy is declared illegal or unenforceable by any court of competent jurisdiction and cannot be modified to be enforceable, that provision will immediately become null and void, leaving the remainder of this Policy in full force and effect.

**Q.**   **Other Insurance**

If there is other valid and collectible insurance, then the **Insurer** shall not be liable except to the extent that the loss exceeds such other valid and collectible insurance.

Under Coverage C only, when the **Named Insured** is required by contract, agreement or permit to include any person or entity as an additional insured, such coverage shall be provided on a primary and non-contributory basis.

**R.**   **Insurance Under Multiple Policies**

Progressive, indivisible **Bodily Injury, Property Damage,** or **Environmental Damage** over more than one **Policy Period,** and resulting from the same or related **Pollution Condition,** shall be considered to have occurred only in the **Policy Period** in which the first exposure to the **Pollution Condition** takes place. If the date of that first exposure (1) is prior to the beginning of the Policy Period of the first Environmental Protective, Professional and Pollution Liability Policy issued to the Insured by the **Insurer,** or (2) cannot be determined, then such progressive, indivisible **Bodily Injury, Property Damage, or Environmental Damage** shall be considered to have occurred only on the first day of the **Policy Period** of the first Environmental Protective, Professional and Pollution Liability Policy issued to that **Insured** by the **Insurer.**

*Eugene K. Hinman*

Authorized Representative

Eugene K. Hinman
CEO
Pioneer Special Risk Insurance Services, Inc.

# PIONEER
## UNDERWRITERS

Insured Name: Ric-Man Construction, Inc.                    Effective Date: 12/15/2018

Policy No: CPP-0000190-01                                   Endorsement No: 1

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
### LLOYD'S AMENDATORY WORDINGS (NO TRIA) - EIL

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the same and apply to this endorsement:

### LLOYD'S SYNDICATE ENDORSEMENT

The Underwriters referred to in the Declarations are identified as follows:

- Proportion Percent: 100%
  Pioneer Underwriters – Syndicate Number 1980
  Contract No: B131210655U18
  Registration Date: January 1, 2018

PSR-LL-EIL-END-01 (01/18)

### NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

> Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I.      Under any Liability Coverage, to injury, sickness, disease, death or destruction

> (a)     with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

> (b)     resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.     Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness,

**PIONEER**
UNDERWRITERS

disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.     Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

       (a)     the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

       (b)     the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

       (c)     the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.     As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means

       (a)     any nuclear reactor,

       (b)     any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

       (c)     any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

       (d)     any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

**PIONEER**
UNDERWRITERS

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

NMA1256
17/03/1960

## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

NMA1477
13/02/1964

## SEVERAL LIABILITY NOTICE

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.

08/94
LSW1001

## WAR AND CIVIL WAR EXCLUSION CLAUSE

Notwithstanding anything to the contrary contained herein this Policy does not cover Loss or Damage directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalisation or requisition or destruction of or damage to property by or under the order of any government or public or local authority.

NMA0464
01/01/1938

## SANCTION LIMITATION AND EXCLUSION CLAUSE

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

LMA3100
15 September 2010

## TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting

# PIONEER
### UNDERWRITERS

from or in connection with any act of terrorism regardless of any other cause or event contributing concurrently or in any other sequence to the loss.

For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to any act of terrorism.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

NMA2920
08/10/2001

## U.S. Terrorism Risk Insurance Act of 2002 as amended - Not Purchased Clause

This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.

It is hereby noted that the Underwriters have made available coverage for "insured losses" directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for losses directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

LMA5219
12 January 2015

# PIONEER
## UNDERWRITERS

Insured Name: Ric-Man Construction, Inc.     Effective Date: 12/15/2018

Policy No: CPP-0000190-01        Endorsement No. 2

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
**MINIMUM EARNED PREMIUM**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the same and apply to this endorsement:

**MINIMUM EARNED PREMIUM**

In consideration of the premium paid, **Section X. Conditions, H. Cancellation and Termination** Paragraph 2. is deleted in its entirety and replaced with the following:

2.  This policy may be cancelled by the **Named Insured** for any reason. The Minimum Earned Premium for this Policy will be 25% (at inception) of the total premium for this Policy. In the event that the **Named Insured** cancels the policy and the Minimum Earned Premium stated above is less than one hundred percent (100%), then the amount of premium returnable after the minimum premium earned is retained by the **Insurer** shall be computed in accordance with the customary short rate table and procedure. Cancellation by the **Named Insured** shall also cancel the Extended Reporting Period.

# PIONEER
## UNDERWRITERS

Insured Name: Ric-Man Construction, Inc.

Policy No: CPP-0000190-01

Effective Date: 12/15/2018

Endorsement No: 3

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
**SUPPLEMENTAL COVERAGES AMENDMENT**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the same and apply to this endorsement:

**SUPPLEMENTAL COVERAGES AMENDMENT**

In consideration of the premium paid, Section III., Supplemental Coverages is deleted in its entirety and replaced with the following:

**III.     SUPPLEMENTAL COVERAGES**

The following Supplemental Coverages are included within the each Claim and in the Aggregate Limits of Liability set forth in Item C. of the **Declarations**:

**A.     Claims Expense for Disciplinary Proceedings**

Subject to the Disciplinary Proceedings Limit of Liability stated in Item C.3.. of the **Declarations**, the **Insurer** shall pay on behalf of the **Insured**, expenses which the **Insured** pays because of a disciplinary proceeding first commenced against the **Insured** during the **Policy Period** for **Professional Services** or **Contractor Activities** rendered by the **Insured** or performed on behalf of the **Insured**.

**B.     Litigation Expense Reimbursement**

Subject to the Litigation Expense Limit of Liability stated in Item C.4. of the **Declarations**, the **Insurer** shall reimburse the **Insured's** actual loss of earnings and reasonable expenses incurred when the **Insured** attends a hearing, deposition or trial at the written request of the **Insurer** in the course of defending an otherwise covered **Professional Claim** or **Pollution Claim**.

**C.     Subpoena Expenses Coverage Extension**

Subject to the Subpoena Expenses Limit of Liability stated in Item C.5. of the **Declarations**, the **Insurer** shall, at the **Insured's** request, retain counsel and pay such counsel's reasonable and necessary fees and costs to advise the **Insured** regarding the production of documents and/or represent the **Insured** during the preparation and giving of testimony, in response to a subpoena served on the **Insured,** arising from **Professional Services** or a **Pollution Condition**.

**D.     ADA and FHA Expense Reimbursement**

Subject to the ADA and FHA Expense Limit of Liability stated in Item C.6. of the **Declarations**, the **Insurer** shall reimburse the **Insured's** attorney's fees and other expenses incurred when the **Insured** responds to regulatory or administrative actions brought against it during the **Policy Period** by a government agency under the Americans with Disabilities Act of 1990 (ADA) or the Fair Housing Act (FHA). The regulatory or administrative action must result from the rendering of or failure to render **Professional Services** by the Insured, or by a **Design Professional** for whom

# PIONEER
## UNDERWRITERS

the **Insured** is legally responsible, and be reported to the **Insurer** before any attorney's fees or other expenses are incurred.

**E.**      **Corporate Reputation Rehabilitation**

Subject to the Corporate Reputation Rehabilitation Limit of Liability stated in Item C.7._ of the **Declarations**, the **Insurer** shall pay on behalf of the **Insured**, expenses reasonable and necessary to restore corporate reputation that is a result of a covered **Professional Claim** or **Pollution Claim**. The **Insurer** will consult with the **Insured** over the selection of a public relations firm that meets certain minimum certifications and qualifications (i.e. Examination for Accreditation in Public Relations, Accredited Business Communicator form International Association of Business Communicators).

In addition, Section VI. LIMIT OF LIABILITY AND SELF-INSURED RETENTION, 1. Limit of Liability Each Claim and 2. Limit of Liability in the Aggregate for the Policy Period are deleted in their entirety and replaced with the following:

# VI.     LIMIT OF LIABILITY, DEDUCTIBLE, AND SELF-INSURED RETENTION

1.      Limit of Liability Each Claim:

The Limit of Liability of the **Insurer** for all Supplemental Coverages, **Ultimate Loss, Damages, Mitigation Costs, or Pollution Loss** including **Claims Expense**, or any other coverages afforded in this Policy or endorsements attached thereto, arising out the same or related negligent act, error, omission, incident and/or **Pollution Condition**, shall not exceed the amount stated in Item C.1. of the **Declarations** for each **Claim.**

2.      Limit of Liability in the Aggregate for the Policy Period:

The Limit of Liability of the **Insurer** for all Supplemental Coverages, **Ultimate Loss, Damages,** or **Mitigation Costs, Pollution Loss,** including **Claim Expense**, or any other coverages afforded in this Policy or endorsements attached thereto, shall not exceed the amount stated in Item C.2. of the **Declarations** as the Aggregate for the **Policy Period.**

# PIONEER
## UNDERWRITERS

Insured Name: Ric-Man Construction, Inc.

Effective Date: 12/15/2018

Policy No: CPP-0000190-01

Endorsement No: 4

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
**SEPARATE LIMIT OF LIABILITY BY COVERAGE PART ENDORSEMENT**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the same and apply to this endorsement:

**SEPARATE LIMIT OF LIABILITY BY COVERAGE PART ENDORSEMENT**

In consideration of the premium charged, it is understood and agreed that **Declarations**, **Item C. Limits of Liability**, 1. each Claim and 2. in the Aggregate, is amended to read as follows:

| Coverage Part | Limit of Liability |
|---|---|
| Coverage A- Protective Errors and Omissions | Per PSR-PCE-PCPP-END-33 (09/16) |
| Coverage B- Professional Liability | $5,000,000 each Claim; $5,000,000 in the Aggregate |
| Coverage C- Contractor's Pollution Liability | $10,000,000 each Claim; $10,000,000 in the Aggregate |
| Coverage D- Transportation Pollution Liability | $10,000,000 each Claim; $10,000,000 in the Aggregate |
| Coverage E- Non-Owned Disposal Site | $10,000,000 each Claim; $10,000,000 in the Aggregate |
| Coverage F- Mitigation of Damages | $250,000 each Claim; $250,000 in the Aggregate |
| Coverage G- Site Pollution Liability | $2,000,000 each Claim; $2,000,000 in the Aggregate |
| | |
| Policy Aggregate: | $10,000,000 |

All each Claim Limit of Liability and Aggregate Limit of Liability per Coverage Part will concurrently erode the Policy Aggregate Limit of Liability designated in the Policy Aggregate specified above.

# PIONEER
## UNDERWRITERS

Insured Name: Ric-Man Construction, Inc.

Effective Date: 12/15/2018

Policy No: CPP-0000190-01

Endorsement No: 5

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
**POLICY CHANGE(S) ENDORSEMENT**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the same and apply to this endorsement:

**POLICY CHANGE(S) ENDORSEMENT**

**Coverage Part Limit of Liability**

Coverage A - Protective Errors and Omissions $5,000,000 each Claim; $5,000,000 in the Aggregate

The Limits of Liability afforded for Coverage A – Protective Errors and Omissions are subject to the following retroactive dates:

$1,000,000 each Claim / $1,000,000 Aggregate is subject to a retroactive date of June 1, 2017.

$4,000,000 each Claim / $4,000,000 Aggregate is subject to a retroactive date of August 18, 2017.

# PIONEER
## UNDERWRITERS

Insured Name: Ric-Man Construction, Inc.

Policy No: CPP-0000190-01

Effective Date: 12/15/2018

Endorsement No: 6

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
**ADDITIONAL INSURED SCHEDULE**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the same and apply to this endorsement:

**ADDITIONAL INSURED SCHEDULE**

In consideration of the premium charged, it is hereby understood and agreed that the entity (ies) scheduled below is an (are) **Insured(s)** under the Policy:

- Ric-Man Construction Detroit, Inc.

# PIONEER
## UNDERWRITERS

Insured Name: Ric-Man Construction, Inc.        Effective Date: 12/15/2018

Policy No: CPP-0000190-01        Endorsement No: 7

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
**DELETION OF CONDITION K – CHOICE OF LAW AND JURISDICTION**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the same and apply to this endorsement:

**DELETION OF CONDITION K – CHOICE OF LAW AND JURISDICTION**

In consideration of the premium charged, it is hereby understood and agreed that Section **X. Conditions** K. Choice of Law and Jurisdiction is deleted in its entirety.

# PIONEER
## UNDERWRITERS

Insured Name: Ric-Man Construction, Inc.

Effective Date: 12/15/2018

Policy No: CPP-0000190-01

Endorsement No: 8

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
**SITE POLLUTION AMENDATORY**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the same and apply to this endorsement:

**SITE POLLUTION AMENDATORY**

In consideration of the premium charged, it is hereby understood and agreed that **I. INSURING AGREEMENT, Coverage G – Site Pollution Liability** is deleted in its entirety and replaced with the following:

The **Insurer** shall pay on behalf of the **Insured** for a **Pollution Loss** and related **Claim Expense** in excess a $25,000  Each Claim Self-Insured Retention because of a **Pollution Condition** on, at, under or migrating from an **Insured Property,** which the **Insured** becomes legally obligated to pay as a result of a **Pollution Claim** first made against the **Insured** during the **Policy Period**, but only if the **Insured** reports the **Pollution Claim** to the **Insurer,** in writing, during the **Policy Period** or any applicable  **Extended Reporting Period**.

It is further agreed that Section **V. Exclusions** is amended with the addition of the following:

**Retroactive Date**

**Pollution Conditions** that commenced prior to the **Retroactive Date** stated in Item E. of the **Declarations**, which includes any dispersal, migration or further movement of the **Pollution Conditions** on or after the **Retroactive Date**

# PIONEER
## UNDERWRITERS

Insured Name: Ric-Man Construction, Inc.

Effective Date: 12/15/2018

Policy No: CPP-0000190-01

Endorsement No: 9

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
**INSURED PROPERTY SCHEDULE**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the same and apply to this endorsement:

| Insured Property: | Retroactive Date: |
|---|---|
| 6850 19 Mile Road Sterling Heights, MI 48314 | 10/14/2011 |
| 42600 R. Mancini Drive Sterling Heights, MI | 12/01/2016 |

# PIONEER
## UNDERWRITERS

Insured Name: Ric-Man Construction, Inc.                    Effective Date: 12/15/2018

Policy No: CPP-0000190-01                                    Endorsement No: 10

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
**PRIOR NOTICE EXCLUSION**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the same and apply to this endorsement:

**PRIOR NOTICE EXCLUSION**

In consideration of the premium paid, it is hereby understood and agreed that this Policy will not apply to:

Any prior, current or future claims, losses, incidents, "bodily injury", "property damage", "pollution event", "pollution condition", "claim expenses" or "supplementary payments"arising from, related to, caused by, resulting from, contributed to or in any way related to:

> Any actual or potential Pollution Condition, Pollution Event, Pollution Claim or Professional Liability Claims previously reported to any prior insurer with respect to any insurance policy procured by or for the benefit of any Insured; or

> Any actual or potential Pollution Condition, Pollution Event, Pollution Claim or Professional Liability Claim that was known by any Insured prior to the effective date of this policy and which could have been reported to any prior insurer under any insurance policy procured by or for the benefit of any Insured

# PIONEER
## UNDERWRITERS

Insured Name: Ric-Man Construction, Inc.                    Effective Date: 12/15/2018

Policy No: CPP-0000190-01                                   Endorsement No: 11

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
**ANTI-STACKING OF POLICY LIMITS ENDORSEMENT**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the same and apply to this endorsement:

**ANTI-STACKING OF POLICY LIMITS ENDORSEMENT**

It is understood and agreed that for **Ultimate Loss**, **Damages**, **Mitigation Costs** and/or a **Pollution Loss** as applicable under this Policy for which coverage may also be provided by CPP-0000191-01 the limit of liability provided by this Policy shall be reduced by the limit of liability provided under CPP-0000191-01.

This endorsement does not increase any Limit of Liability provided on either Policy Declarations page.

All other terms remained unchanged.

# PIONEER
## UNDERWRITERS

Insured Name: Ric-Man Construction, Inc.                                Effective Date: 12/15/2018

Policy No: CPP-0000190-01                                              Endorsement No: 12

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
**SERVICE OF SUIT CLAUSE (U.S.A.)**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the same and apply to this endorsement:

**SERVICE OF SUIT CLAUSE (U.S.A.)**

It is agreed that in the event of the failure of the Insurer hereon to pay any amount claimed to be due hereunder, the Insurer hereon, at the request of the Insured (or Reinsured), will submit too the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of the Insurer's rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.

It is further agreed that service of process in such suit may be made upon

> Mendes & Mount, LLP
> 750 Seventh Avenue
> New York, NY 10019-6829
> USA

and that in any suit instituted against any one of them upon this contract, the Insurer will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of the Insurer in any such suit and/or upon the request of the Insured (or Reinsured) to give a written undertaking to the Insured (or Reinsured) that they will enter a general appearance upon the Insurer's behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Insurer hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other office specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured (or Reinsured) or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

NMA1998
24/04/1986

# Exhibit B

Tashia Marshall   5/29/2018 10:07 AM   WAYNE COUNTY CLERK   Cathy M. Garrett   FILED IN MY OFFICE   18-005697-CB

## STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

WADE TRIM ASSOCIATES, INC.,
a Michigan corporation,

        Plaintiff,

v.

RIC-MAN CONSTRUCTION, INC.,
a Michigan corporation, and OAKLAND
COUNTY WATER RESOURCES
COMMISSIONER, COUNTY AGENCY FOR
THE COUNTY OF OAKLAND,

        Defendants.

Case No.   18-005697-CB

Hon. Edward Ewell, Jr.

**FIRST AMENDED COMPLAINT**

---

James R. Case (P31583)
Kerr, Russell and Weber, PLC
Attorney for Plaintiff
500 Woodward Avenue, Suite 2500
Detroit, MI 48226-3427
(313) 961-0200
jcase@kerr-russell.com

Mark L. McAlpine (P35583)
David A. Sebastian (P47139)
Attorneys for Defendant, Ric-Man
3201 University Drive, Suite 200
Auburn Hills, MI 48326-2395
(248) 373-3700
mlmcalpine@mcalpinepc.com
dasebastian@mcalpinepc.com

Jeffrey M. Sangster (P30791)
R. Edward Boucher (P57251)
Kotz Sangster Wysocki, P.C.
Attorneys for Defendant, OCWRC
400 Renaissance Center, Suite 3400
Detroit, MI  48243
(313) 259-8300
jstangster@kotzsangster.com
rboucher@kotzsangster.com

---

Pursuant to MCL 600.8031 and MCR 2.112(O)(1), this case
involves a business or commercial dispute and meets the
statutory requirements to be assigned to the business court.
There is no other pending or resolved civil action arising out of the
transaction or occurrence alleged in the First Amended Complaint.

{34874/19/D1265656.DOCX;1}

Tashia Marshall    5/29/2018 10:07 AM    WAYNE COUNTY CLERK    Cathy M. Garrett    FILED IN MY OFFICE    18-005697-CB

## FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, Wade Trim Associates, Inc., by and through its attorneys, Kerr, Russell and Weber, PLC, and for its First Amended Complaint against Defendants, Ric-Man Construction, Inc., and Oakland County Water Resources Commissioner, County Agency for the County of Oakland, states as follows:

1.      Wade Trim Associates, Inc. ("Wade Trim") is a Michigan corporation, with its principal place of business in the City of Detroit, Wayne County, Michigan.

2.      Ric-Man Construction, Inc. ("Ric-Man") is a Michigan corporation, and regularly conducts business in Wayne County, Michigan.

3.      Oakland County Water Resources Commissioner ("OCWRC") is a County Agency for the County of Oakland.

4.      Venue is proper in Wayne County pursuant to MCLA 600.1621 and MCLA 600.1641.

5.      The amount in controversy is in excess of Twenty-Five Thousand ($25,000.00) dollars.

### COUNT I
### BREACH OF CONTRACT – RIC-MAN

6.      Wade Trim incorporates by reference the allegations contained in paragraphs 1 through 5.

7.      On September 18, 2014, Ric-Man entered into a contract with OCWRC (the "Contract") for a project known as Middlebelt Transport and Storage Tunnel (the "Project"). (The Contract is voluminous and is in the possession of Ric-Man).

8.      The Contract required Ric-Man to perform and complete each and every one of the obligations required by the Contract Documents.

9.      The "Contract Documents" were a defined term the definition of which appeared in the General Conditions and included, without limitation, the Escrow Bid Document Specifications, Proposal, Specifications, General Conditions, Supplemental Conditions, and any attachments or addenda thereto agreed to by Ric-Man and OCWRC.

10.     The Contract Documents identified Wade Trim as the "Engineer."

11.     The General Conditions contained Article 52, entitled "Insurance and Indemnification."

12.     Subparagraph D of Article 52, in pertinent part, reads as follows:

(1)      To the fullest extent permitted by law, Contractor shall indemnify, defend . . . and hold harmless . . . Engineer, and any additional indemnities identified in the Supplemental Conditions and their respective directors, officers, members, partners, affiliates, employees, agents and successors, from and against any and all liabilities, claims, causes of action, lawsuits, liens, injuries, damages, losses and expenses (collectively "Demands") to the extent caused by, arising out of, resulting from or occurring in connection with:

(a)      Contractor's breach of, or failure to comply with, the Agreement or any other contract that it enters into regarding the Work, including any Default; . . .

*        *        *

(2)      To the extent caused by, arising out of, resulting from, or occurring in connection with the provisions of the above paragraph 52.E.1 (sic), Contractor's indemnity obligations under this Agreement shall include, but are not limited to:

(a)      Indemnity for all damages and judgment interest, all costs and fees, including, but not limited to, all defense costs, expenses and actual attorneys' fees, and all settlement payments relating to, arising out of, resulting from or in any way connected with any Demand requiring indemnity by this Agreement;

(b)      All expenses, including, but not limited to, costs, expenses and actual attorneys' fees, incurred in securing and enforcing indemnity from Contractor if Contractor fails or refuses

18-005697-CB FILED IN MY OFFICE Cathy M. Garrett WAYNE COUNTY CLERK 5/29/2018 10:07 AM Tashia Marshall

promptly to fulfill any of the indemnity obligations under this Agreement;

(c)    All indemnification obligations imposed upon Owner or Engineer, or both, arising out of or in connection with the Work or the Agreement; . . .

\*    \*    \*

(3)    Owner's, Engineer's or other indemnities' fault or negligence shall not be a defense to or bar Contractor's duty to indemnify . . . Engineer or such indemnity (sic) except where the negligence of the Owner, Engineer or indemnity (sic) is the sole cause of the injury giving rise to the Demand.

\*    \*    \*

(8)    The indemnification obligations of Contractor under this Agreement shall not extend to the liability of Engineer and Engineer's officers, directors, partners, employees, agents, consultants and subcontractors arising solely out of:

(a)    the preparation of or the failure to prepare maps, drawings, opinions, reports, surveys, change orders, designs, or specifications; or

(b)    giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage."

13.    As such, Wade Trim was an intended third party beneficiary of the Contract, and as such is entitled to enforce the indemnification rights provided in the Contract to the Engineer against Ric-Man, and specifically to enforce the rights granted in the Indemnification Clause set forth in Article 52.D of the Contract.

14.    The General Conditions that were part of the Contract contained Article 10, entitled "Submittals."

15.    Article 10 of the General Conditions, in pertinent part, states as follows:

10.    SUBMITTALS

A.  The Contractor shall submit to the Engineer full information as to the materials, equipment, and processes that the Contractor proposes to furnish. This information shall be complete to the extent that the Engineer may intelligently judge if the proposed materials, equipment, and processes will meet the Contract requirements. The Engineer shall review and return the submittals with or without exceptions, and in no event shall the Engineer's review be treated or deemed an approval, or as acceptance of a substitute or of an equal without fully complying with the processes required in the Contract Documents.

B.  The return of information covering materials, equipment, and processes by the Engineer shall in no way release the Contractor from its responsibility for the proper design, installation, and performance of any material, equipment, or arrangement, or from its liability to replace same should it prove defective or unsuitable.

*       *       *

D.  Additional Submittal requirements of the Contractor are included in Section 01 3300."

16.  The General Conditions that were part of the Contract contained an Article 23, entitled "Shop Drawings."

17.  Article 23 of the General Conditions, in pertinent part, states as follows:

"Where called for in the Specifications, the Contractor shall submit to the Engineer for review in not less than five (5) copies, Details, Specifications, Cuts and Drawings of such equipment and structural work as may be required. The Contractor shall make any changes or alterations required by the Engineer and re-submit it without delay. The Engineer review shall not relieve the Contractor of responsibility for errors in the Drawings as the Engineer's checking is intended to cover compliance with the Drawings and Specifications and not to enter into every detail of the shop work. No Work shall be undertaken, nor invoiced for, until the Engineer has returned the Shop Drawings either without exceptions, or with exceptions as noted with authorization to proceed. Shop Drawings shall be revised as necessary until returned by the Engineer without exceptions, or exceptions as noted with authorization to proceed. The Engineer's comments on Shop Drawings, if any, shall not constitute: a change or alteration to the Contract Documents; a work directive; nor approval of any change in the documents, or work required thereby.

18-005697-CB   FILED IN MY OFFICE   Cathy M. Garrett   WAYNE COUNTY CLERK   5/29/2018 10:07 AM   Tashia Marshall

Tashia Marshall   5/29/2018 10:07 AM   WAYNE COUNTY CLERK   Cathy M. Garrett   FILED IN MY OFFICE   18-005697-CB

18.    The Contract Documents also included Specification Section 31-2319, "Groundwater Control."

19.    Specification Section 31-2319, in pertinent part, states as follows:

    1.01    Scope

        A.    Section includes:

           *      *      *

           2.    The Contractor will be responsible for design of groundwater control system components and for procuring all necessary permits for the work.

           *      *      *

           5.    Operating groundwater control system to obtain and maintain groundwater control during construction.

    1.03    Quality Assurance

        *      *      *

        B.    Verify that geotechnical instrumentation baseline readings were obtained prior to initiating groundwater control operations.

    1.04    Site Conditions

        *      *      *

        B.    Protection of existing structures:

           *      *      *

           2.    Do not interrupt existing utilities serving facilities occupied and used by the Owner or others, except when permitted in writing by the Engineer, and then only after acceptable temporary utility services have been provided.

        C.    Existing individual drinking wells

1. Where individual drinking wells are affected by the groundwater control operations, provide potable water supply and replace water supply wells.

1.05    Submittals

A.    Submit design and support data as indicated for all excavations where dewatering or depressurization is necessary to maintain a stable and dry excavation.

B.    Submit detailed plans of the proposed system including the following:

   1. A detailed description of equipment and materials to be used and the procedures for installation, operation, and maintenance in relation to the construction sequences of the shafts including size of pumps and water discharge lines and their location to water discharge points.

   2. Detailed means and methods related to well drilling, well installation, and subsequent well development procedures.

   3. Locations and depths of all groundwater control components including wells, well points, eductor wells, vacuum wells, points of disposal of pumped water, and type and location of groundwater monitoring.

   *       *       *

D.    Submit working drawings of the design of the groundwater control system including calculations and drawings which shall be signed by a Professional Engineer licensed in the State of Michigan.

   *       *       *

Part 3 – Execution

3.01    General

   *       *       *

B.    Install geotechnical instrumentation and verify that initial readings were obtained prior to installation of groundwater

18-005697-CB   FILED IN MY OFFICE   Cathy M. Garrett   WAYNE COUNTY CLERK   5/29/2018 10:07 AM   Tashia Marshall

control operations. Furnish, install, monitor, maintain and remove groundwater observation wells as specified in Section 31 0913 Geotechnical Instrumentation and Monitoring. At least two wells are required for each groundwater control system; the Engineer may require additional wells and other geotechnical instrumentation depending on the design of the system.

\*       \*       \*

D.     Provide potable water and replace water supply wells to residences affected by the groundwater control operations.

E.     Provide a Professional Engineer licensed in the State of Michigan, to prepare groundwater control system designs and submittals.

\*       \*       \*

L.     The impact of anticipated subsurface soil/water conditions shall be considered when selecting methods of excavation and groundwater control systems. Where groundwater levels are above the proposed bottoms of excavations, a pumped dewatering/depressurization system is expected for pre-drainage of the soils prior to excavation to final grade and for maintenance of the lowered groundwater level until construction has been completed to such an extent that the structures, pipes, conduit, fill and other associated structures will not be floated or otherwise damaged. Type of system, spacing of units and other details of the work are expected to vary with soil/water conditions at a particular locations (sic).

\*       \*       \*

P.     Perform groundwater control operations in a manner that will protect existing roads, structures, and above ground and underground utilities. The Contractor will be solely responsible for damage to roads, buildings or structures, sewers and other utility installations, pavements, sidewalks, and other property which may result from Contractor's groundwater control operations."

20.     The Contract Documents also include a Specification Section 31-3200, "Soil Stabilization."

18-005697-CB   FILED IN MY OFFICE   Cathy M. Garrett   WAYNE COUNTY CLERK   5/29/2018 10:07 AM   Tashia Marshall

21. Specification Section 31-3200, in pertinent part, states as follows:

Part 1 – General

1.01 Scope

A. Section includes requirements for soil stabilization. The method of soil stabilization at specific locations is determined by the Contractor, subject to review and approval by the Engineer. Furnish all design, labor, equipment, and materials necessary to perform the required soil stabilization. Acceptable methods of stabilization are groundwater control (dewatering or depressurizing), jet grouting, and ground freezing. Other methods of soil stabilization may be considered, subject to review and approval by the Engineer.

22. On July 30, 2015, as was required by the Contract Documents, Ric-Man tendered Submittal #34A to Wade Trim, a copy of which is voluminous and in the possession of Ric-Man.

23. In Submittal #34A, Ric-Man represented, among other things, that:

a. Dewatering wells at Station 14+00 would be screened approximately between Elevations 717 to 733 (approximately 65' to 70' at their deepest below ground surface).

b. The initial wells will be pumped for a period of time and drawdown of the aquifer will be monitored using existing and new wells and piezometers. The information obtained from the initial wells will be used to evaluate the hydrogeological characteristics of the confined aquifer and for designing any additional dewatering wells that may be needed.

c. A pump test will be completed on the STA 14+00 well after installation of the second well (presumably at STA 13+00). Similarly, a pump test will be completed on the TS-6 well after the second well near TS-6 is installed. The pump tests will be used to evaluate additional well needs. The pump test durations will be a minimum of 72 hours with water levels continuously measured and recorded at the second well and adjacent monitoring wells. The dewatering wells will be pumped with recovery periods in between for the aquifer to recharge to near-normal levels. We may also complete a pump test consisting of pumping multiple wells at STA. 14+00 and TS-6 to monitor the effects of combined drawdown from the wells.

Tashia Marshall   5/29/2018 10:07 AM   WAYNE COUNTY CLERK   Cathy M. Garrett   FILED IN MY OFFICE   18-005697-CB

d.    The actual limits of drawdown during the well installation and development and the pump tests (with durations up to 72 hours) are not known at this time and will be determined in the field based on the lateral extent of the gravelly sand layer and well yields. For the purposes of our evaluation we reviewed the NTH well data for wells within a 1/8 mile of the tunnel alignment between STA. 9+00 and STA. 19+00 (500 feet north and south of STA. 14+00) that are screened at a depth of less than 75 feet. … There were no identified drinking water wells in the vicinity of STA. 14+00 that are expected to be impacted by the initial dewatering well pumping program.

24.    On or about June 17, as was required by the Contract Documents, Ric-Man tendered Submittal #35A, Potable Water Emergency Action Plan, to Wade Trim, a copy of which is voluminous and in the possession of Ric-Man.

25.    In Submittal #35A, Ric-Man represented, among other things:

a.    We have retained GEI to write our Dewatering Plan. As part of the plan, they will determine the residential wells that are in the influence of construction dewatering as well as address the potential impact of the dewatering effort.

b.    The Oakland County Health Department has provided residential well locations and data of each well in the vicinity of the project. The data will be used by GEI to determine the impact.

c.    The dewatering plan has been phased into two groupings: Test Well Program, and Long Term Construction Dewatering.

d.    After the Test Well Program is complete, the Long Term Construction Dewatering Program will be submitted. At that time we will re-evaluate residential wells for possible impact based on long term construction dewatering.

26.    The Contract Documents required Ric-Man to follow the dewatering design and plan that it had submitted.

27.    By September 18, 2015, Ric-Man had installed four dewatering wells between Stations 13+05 and 16+50.

18-005697-CB   FILED IN MY OFFICE   Cathy M. Garrett   WAYNE COUNTY CLERK   5/29/2018 10:07 AM   Tashia Marshall

28.     The dewatering wells Ric-Man installed were screened at depths that ranged from 100 to 130 feet below ground surface with pumps installed between 86 and 91 feet below ground surface, depths significantly below what had been represented in Submittals #34A.

29.     Contrary to the representations in Submittals #34A and/or #35A, Ric-Man failed to perform pump tests, failed to allow the aquifer to recharge after initial pumping, failed to evaluate the hydrogeological characteristics of the confined aquifer and failed to provide a final dewatering plan.

30.     Ric-Man became immediately aware that residential wells were being impacted by its dewatering effort, but refused, despite repeated requests, to re-evaluate its plan, refused to submit a final dewatering plan, refused to submit an alternative plan, and refused to alter the dewatering work that it had implemented.

31.     Ric-Man's dewatering continued to impact residential wells and but for the re-design that OCWRC required Wade Trim to perform would have impacted many more wells even assuming that permits for additional wells could have been acquired by Ric-Man which, based on Ric-Man's then existent dewatering operation, was highly unlikely.

32.     Ric-Man failed to perform each and every one of the obligations required by the Contract Documents, specifically failing to perform in accordance with Articles 10 and 23 of the General Conditions, and in accordance with Specification Sections 31-2319 and 31-3200, and constituted a breach of contract.

33.     OCWRC has failed to pay Wade Trim all of the sums due under the Engineering Services Agreement entered into between Wade Trim and OCWRC in an amount in excess of $1.1 million dollars.

18-005697-CB   FILED IN MY OFFICE   Cathy M. Garrett   WAYNE COUNTY CLERK   5/29/2018 10:07 AM   Tashia Marshall

34.     On information and belief, OCWRC has failed and refused to pay the sums due to Wade Trim because OCWRC contends that Wade Trim, its subconsultant, and Ric-Man are responsible for costs incurred in redesigning the Project and for providing water to residents whose drinking wells ceased to function and/or that had to be repaired or replaced as a result of Ric-Man's breach of the Contract, in particular, Ric-Man's improper dewatering operations that Ric-Man improperly implemented and/or implemented dewatering operations contrary to the requirements of the Contract and in contradiction to the manner indicated in its submittals.

35.     As the result of OCWRC's claims and actions, Wade Trim has suffered damages, losses and expenses.

36.     Wade Trim's damages, losses and expenses were caused by, arose from, resulted from or occurred in connection with Ric-Man's breach of or failure to comply with the Contract.

37.     Per the Contract, specifically Article 52.D of the General Conditions, Wade Trim is entitled to have Ric-Man defend it from the claims of OCWRC, held harmless and indemnified from such claims, and is entitled to recover from Ric-Man damages and judgment interest on any amounts not paid Wade Trim by OCWRC, defense costs, actual attorneys' fees, costs and actual attorneys' fees in securing and enforcing indemnity from Ric-Man, and any other rights granted to Wade Trim under Article 52D of the General Conditions.

38.     Wade Trim is not at fault and/or was not negligent in providing engineering services to OCWRC and, therefore, there is no defense to Wade Trim's right to enforce Article 52.D of the General Conditions.

**WHEREFORE**, Wade Trim prays that this Court declare that Wade Trim is entitled to enforce all rights provided in favor of Wade Trim and against Ric-Man as allowed under Article 52.D of the General Conditions of the Contract including, but not limited to money damages, costs,

interest and actual attorneys' fees, and to recover money damages for and costs incurred, including but not limited to non-payment of engineering services by OCWRC that resulted from Ric-Man's breach of the Contract.

## COUNT II
## BREACH OF CONTRACT – OCWRC

39.    Wade Trim incorporates by reference the allegations contained in paragraphs 1 through 38.

40.    On August 30, 2012, Wade Trim entered into an Engineering Services Agreement ("ESA") with OCWRC, a copy of which is attached as Exhibit 1.

41.    The ESA was broken into a number of different phases in Section A – Engineering Services, including "Item No. 3 The Construction Phase" and "Item No. 4 Construction Surveying Layout, Construction Observation and Resident Project Representative."

42.    Wade Trim performed all of the services required in "Item No. 3 The Construction Phase" and "Item No. 4 Construction Surveying Layout, Construction Observation and Resident Project Representative" per the terms set forth in the ESA.

43.    Section C of the ESA is entitled "Compensation for Engineering Services."

44.    Item No. 3 and Item No. 4 of Section C of the ESA, respectively, budgeted the sum of $455,420.00 for Construction Phase Services and $1,061,900.00 for Construction Observation and Resident Project Representative Services.

45.    During the course of construction, OCWRC verbally authorized and directed Wade Trim to perform substantial additional work in excess of the budgeted sums under Item No. 3 and Item No. 4 of Section C of the ESA.

46.    Pursuant to Item No. 4 of Section C of the ESA, compensation for additional work under the ESA was to be authorized by a written work order.

{34874/19/D1265656.DOCX;1}                                    13

47.     In accordance with the terms of the ESA, Wade Trim requested a written work order from OCWRC on August 5, 2016, when the work authorized and directed by OCWRC first exceeded the budgeted sums under Item No. 3 and Item No. 4 of Section C of the ESA. In response, OCWRC expressly stated to Wade Trim that it did not want to execute a written work order. Instead, OCWRC directed Wade Trim to continue working based on the express promise that Wade Trim would be paid for all additional work.

48.     OCWRC established a pattern whereby OCWRC verbally authorized and directed Wade Trim to perform additional work and OCWRC then paid Wade Trim for that additional work. This course of conduct waived the requirement under the ESA that compensation for additional work was to be authorized by a written work order.

49.     In late 2017, OCWRC requested that Wade Trim submit a letter identifying all costs to date as well as the estimated cost to complete construction. Wade Trim submitted the letter on January 5, 2018.

50.     On February 5, 2018, OCWRC informed Wade Trim they would make no additional payments to Wade Trim.

51.     To date, OCWRC has wrongfully failed to pay Wade Trim the sums justly due Wade Trim for the work performed under Item No. 3 and Item No. 4 of Section A of the ESA in the amount of $500,207.45.

52.     OCWRC's failure to pay Wade Trim for these services constitutes a breach of the ESA and has resulted in damages to Wade Trim.

53.     Section A, Item No. 5 of the ESA is entitled "Engineering Redesign."

54.     Beginning in October 2015, and continuing into 2016, OCWRC requested that Wade Trim investigate alternatives for completing the Project and then ultimately to redesign a

portion of the Construction Documents which OCWRC had previously approved, which requirement included, but was not limited to the elimination of TS-6, the northernmost 1,652.51 feet of the tunnel, and modifications to TS-5.

55.     According to Section A, Item No. 5 of the ESA, these services were to be paid as an "Additional Special Service."

56.     The performance of the Engineering Redesign Service was not made necessary by or the result of any fault or omission of Wade Trim to properly perform its professional engineering services in conformance with the standard of practice, but rather resulted from dewatering operations implemented by Ric-Man in contradiction to Ric-Man's submittals.

57.     Section C, Item No. 5 is entitled, "Engineering Redesign Compensation."

58.     Section C, Item No. 5 (2), in pertinent part, states that "If the additional Engineering Redesign is added to the Project . . . after bidding, then Engineer is to be compensated when funds are available for the additional work on the basis of actual direct payroll wages times a multiplier of 3.08 . . ."

59.     The additional Engineering Redesign services were requested by OCWRC in writing and Wade Trim knows of no reason why funds are not available to make payments due to Wade Trim, or in the alternative, knows of no effort that has been undertaken by OCWRC to obtain funds to pay Wade Trim.

60.     The amount due Wade Trim for additional Engineering Redesign to date is in excess of $600,000.00.

61.     To date, OCWRC has wrongfully failed to pay the sums justly due to Wade Trim for additional Engineering Redesign.

62.     OCWRC's failure to pay Wade Trim for these services constitutes a breach of the ESA and has resulted in damages to Wade Trim.

**WHEREFORE**, Wade Trim prays that this Court enter judgment in its favor against OCWRC in an amount in excess of $1,100,000.00, together with interest, costs and attorneys' fees wrongfully sustained.

## COUNT III
## UNJUST ENRICHMENT – OCWRC

63.     Wade Trim incorporates by reference the allegations contained in paragraphs 1 through 62.

64.     As detailed in Count II, Wade Trim performed substantial work under Item No. 3 and Item No. 4 of Section A of the ESA as well as Engineering Redesign services for the benefit of OCWRC.

65.     OCWRC has received and continues to receive the benefit of the labor performed by Wade Trim.

66.     OCWRC has not paid Wade Trim for the labor performed.

67.     Unless OCWRC is made to pay for the labor performed by Wade Trim, OCWRC will be unjustly enriched in an amount in excess of $1,100,000.00.

**WHEREFORE**, Wade Trim prays that this Court enter judgment in its favor against OCWRC in an amount in excess of $1,100,000.00, together with interest, costs and attorneys' fees wrongfully sustained.

18-005697-CB   FILED IN MY OFFICE   Cathy M. Garrett   WAYNE COUNTY CLERK   5/29/2018 10:07 AM   Tashia Marshall

Tashia Marshall    5/29/2018 10:07 AM    WAYNE COUNTY CLERK    Cathy M. Garrett    FILED IN MY OFFICE    18-005697-CB

Respectfully submitted,

**KERR, RUSSELL AND WEBER, PLC**


By: */s/James R. Case*
  James R. Case (P31583)
Attorney for Plaintiff
500 Woodward Avenue, Suite 2500
Detroit, MI  48226-3427
(313) 961-0200
jcase@kerr-russell.com

Dated:  May 29, 2018

# Exhibit C

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE**

WADE TRIM ASSOCIATES, INC.,
a Michigan corporation,

       Plaintiff/Counter-Defendant,

v.

RIC-MAN CONSTRUCTION, INC.,
a Michigan corporation, and
OAKLAND COUNTY WATER
RESOURCES COMISSIONER, COUNTY
AGENCY FOR THE COUNTY OF OAKLAND,

       Defendants/Counter-Plaintiffs.

Case No.: 18-005697-CB
Hon. Edward Ewell Jr.

> **OAKLAND COUNTY WATER**
> **RESOURCES COMMISSIONER'S**
> **CROSS-CLAIM AGAINST**
> **RIC-MAN CONSTRUCTION, INC.**

---

**DYKEMA GOSSETT PLLC**
James R. Case (P31583)
Bryce A. Rucker (P79455)
A. Joseph Duffy IV (P82961)
*Attorneys for Plaintiff*
400 Renaissance Center
Detroit, MI 48243
(313) 568-6800
jcase@dykema.com
brucker@dykema.com
jduffy@dykema.com

**KOTZ SANGSTER WYSOCKI P.C.**
Jeffrey M. Sangster (P30791)
R. Edward Boucher (P57251)
Mark F.C. Johnson (P80539)
*Attorneys for OCWRC*
400 Renaissance Center, Suite 3400
Detroit, MI 48243
(313) 259-8300
jsangster@kotzsangster.com
rboucher@kotzsangster.com
mjohnson@kotzsangster.com

**MCALPINE PC**
Mark L. McAlpine (P35583)
Ted Peters (P40220)
Ashley L. McAlpine (P79203)
*Attorney for Ric-Man Construction*
3201 University Drive, Suite 200
Auburn Hills, MI 48326
mlmcalpine@mcalpinepc.com
tpeters@mcalpinepc.com
almcalpine@mcalpinepc.com

---

KOTZ SANGSTER WYSOCKI P.C. ATTORNEYS AND COUNSELORS AT LAW

Document received by the MI Wayne 3rd Circuit Court.

1

### OAKLAND COUNTY WATER RESOURCES COMMISSIONER'S CROSS-CLAIM AGAINST RIC-MAN CONSTRUCTION, INC.

Now comes Oakland County Water Resources Commissioner ("OCWRC"), and for its Cross-Claim against Cross-Defendant Ric-Man Construction, Inc. ("Ric-Man"), Cross-Plaintiff OCWRC states:

#### Parties, Jurisdiction, Venue

1.      OCWRC is a county agency for the County of Oakland, Michigan.

2.      Ric-Man is a Michigan corporation that regularly conducts business in Wayne County, Michigan.

3.      Plaintiff/Counter-Defendant Wade Trim Associates, Inc. ("Wade Trim") is a Michigan corporation, with its principal place of business in Detroit, Michigan, and regularly conducts business in Wayne County, Michigan.

4.      The amount in controversy exceeds $25,000.00, exclusive of interest and costs, therefore vesting this Court with jurisdiction.

5.      This Court is a proper venue pursuant to MCL 600.1621 and MCL 600.1641.

#### General Allegations

6.      OCWRC incorporates all previous averments by reference.

7.      This case arises from the Middlebelt Transport and Storage Tunnel project in Farmington Hills, Michigan (the "Project").

8.      OCWRC is the owner of the Project.

9.      On September 18, 2014, OCWRC entered into a contract with Ric-Man to perform construction services for the Project (the "Contract").

2

KOTZ SANGSTER WYSOCKI P. C.   ATTORNEYS AND COUNSELORS AT LAW

Document received by the MI Wayne 3rd Circuit Court.

10.     The Contract consists of multiple documents that together form the "Contract Documents."   Pursuant to MCR 2.113(C) and (F), the Contract Documents are incorporated by reference into this pleading, are too voluminous to attach, and are already in the possession of all parties to this action.

11.     The Contract Documents describe Ric-Man's performance obligations as the "Work."

12.     The Contract Documents impose express and implied duties on Ric-Man, including, but not limited to the obligation to:

    a.   provide a competent supervisor to oversee its Work at all times;

    b.   design any groundwater control system or soil stabilization system that might be necessary for performance of its Work;

    c.   submit the plan for its groundwater control system to the Engineer, Wade Trim;

    d.   follow the groundwater control plan described in its submittal;

    e.   perform groundwater control operations in a manner that will protect nearby roads and utility services from harm;

    f.   provide potable water to residences adversely affected by its groundwater control operations;

    g.   advise the OCWRC of harm to nearby roads, structures, utilities, and residences that might be caused by its groundwater control operations;

    h.   apply for payment for Work that was actually completed;

    i.   achieve Substantial Completion of the Work by September 17, 2016;

    j.   share schedule float;

Kotz Sangster Wysocki P.C.   Attorneys and Counselors at Law

Document received by the MI Wayne 3rd Circuit Court.

KOTZ SANGSTER WYSOCKI P. C. ATTORNEYS AND COUNSELORS AT LAW

Document received by the MI Wayne 3rd Circuit Court.

k. compensate the OCWRC in the amount of $2,000.00 for each day after September 17, 2016, that substantial completion of the Work has not been achieved for reasons Ric-Man is responsible; and

l. indemnify and defend the OCWRC from all liabilities caused by or arising out of its activities in furtherance of the Work and on the Project.

13. Ric-Man failed to meet several of the duties imposed on it by the Contract Documents (collectively, the "Duties"), thereby causing OCWRC to incur monetary damages.

14. Wade Trim has claimed Ric-Man is responsible for all costs, liabilities, and damages incurred by OCWRC on the Project, including those which are related to groundwater control events. In the event Wade Trim is proven correct, Ric-Man has breached the Contract and is responsible to OCWRC for those costs, liabilities, and damages.

## COUNT I
## BREACH OF CONTACT

15. OCWRC incorporates all previous averments by reference.

16. The Contract is a valid, binding, and enforceable contract.

17. The Contract imposes multiple Duties on Ric-Man, including, but not limited to the Duties listed above.

18. OCWRC has fully performed all Duties and obligations imposed on it by the Contract.

19. Notwithstanding OCWRC's performance, Ric-Man breached the Contract in numerous ways. Ric-Man's breaches include, without limitation, the following:

KOTZ SANGSTER WYSOCKI P. C.  ATTORNEYS AND COUNSELORS AT LAW

Document received by the MI Wayne 3rd Circuit Court.

a. Failing to achieve milestone completion dates for such things as Middlebelt Road, TS-2/DC-1, TS-3, and TS-4;

b. Failing to maintain an accurate progress schedule in breach of General Specification 17 and Specification Section 01 3213;

c. Failing to share schedule float in breach of General Specification 17;

d. Failing to provide OCWRC with a credit in contract time as a result of the elimination of Work on the Project schedule's critical path;

e. Failing to achieve substantial completion of the Work until August 18, 2017;

f. Over-billing for TS-6, including the submittal of pay applications for Work Ric-Man did not actually perform;

g. Failing to properly design groundwater control systems (as alleged by Wade Trim in Wade Trim's First Amended Complaint, attached as Exhibit 1);

h. Failing to account for the possibility of damage to residential wells and damage to Middlebelt Road (as alleged by Wade Trim in Wade Trim's First Amended Complaint, attached as Exhibit 1);

i. Failing to advise OCWRC that groundwater-control activities might impact surrounding structures and residential wells (as alleged by Wade Trim in Wade Trim's First Amended Complaint, attached as Exhibit 1);

j. Damaging existing structures while operating groundwater control systems (as alleged by Wade Trim in Wade Trim's First Amended Complaint, attached as Exhibit 1);

k. Failing to pay for potable water supplied to residential wells (as alleged by Wade Trim in Wade Trim's First Amended Complaint, attached as Exhibit 1);

l. Failing to pay for damage caused to Middlebelt Road (as alleged by Wade Trim in Wade Trim's First Amended Complaint, attached as Exhibit 1);

m. Failing to install and perform groundwater control systems in accordance with approved submittals regarding well depth and pump depth (as alleged by Wade Trim in Wade Trim's First Amended Complaint, attached as Exhibit 1);

n. Failing to perform pump tests promised by its submittals (as alleged by Wade Trim in Wade Trim's First Amended Complaint, attached as Exhibit 1);

o.  Causing an extended closure of Middlebelt Road, in violation of Agreement Article 1.01 (modified by Addendum No. 1);

p.  Failing to provide adequate project management, in violation of General Conditions Sections 21, sub-sections A, C, and E;

q.  Failing to honor its indemnification obligations under the Contract; and

r.  Failing to provide a defense.

20.  As a result of Ric-Man's breaches of the Contract, OCWRC has suffered, and continues to suffer, extensive damages, including without limitation:

a.  An overpayment for TS-6;

b.  Those resulting from Ric-Man's failure to honor its indemnification obligations under the Contract and failure to provide a defense; and

c.  Liquidated damages of $2,000.00 per day, in accordance with Article III of the Agreement, for Ric-Man's delay achieving substantial completion of the Work.

WHEREFORE, OCWRC respectfully requests this Court enter a judgment in favor of OCWRC and against Ric-Man in an amount to be determined at trial, plus all applicable attorney's fees, costs, and interest.

### COUNT II
### DECLARATORY JUDGMENT CONCERNING INDEMNIFICATION

21.  OCWRC incorporates all previous averments by reference.

22.  Importantly, the Contract provides OCWRC with far-reaching indemnification rights against Ric-Man. (See Articles 6, 15, 16, and 52 of the General Conditions).

KOTZ SANGSTER WYSOCKI P. C. ATTORNEYS AND COUNSELORS AT LAW

Document received by the MI Wayne 3rd Circuit Court.

23.     Pursuant to Article 6 of the General Conditions, Ric-Man "shall assume full responsibility for the Work and . . . shall bear all losses . . . [and Ric-Man] shall assume the defense and save harmless [OCWRC]."  (See Article 6 of the General Conditions).

24.     Pursuant to Article 15 of the General Conditions, "[Ric-Man] shall . . . protect all public and private property abutting the site from injury or loss arising in connection with this Contract . . . and shall defend and save [OCWRC] harmless from all such damages or injuries occurring because of this Work."  (See Article 15 of the General Conditions).

25.     Article 16 of the General Conditions requires Ric-Man to "assume full responsibility for the protection of all . . . structures along and near the Work which may be affected by its operations, and shall indemnify, defend and save harmless [OCWRC] against all damages or alleged damages."  (See Article 16 of the General Conditions).

26.     And Article 52 of the General Conditions provides Ric-Man shall indemnify, defend, and hold harmless OCWRC from and against "any and all liabilities, claims, causes of action, lawsuits, liens, injuries, damages, losses and expenses" which are "caused by, arising out of, resulting from or occurring in connection with . . . [Ric-Man's] breach of, or failure to comply with, the [Contract]."  (See Article 52 of the General Conditions).

27.     That is, pursuant to Articles 6, 15, 16, and 52 of the General Conditions, OCWRC is entitled to indemnity from Ric-Man for any and all claims, losses, liability, damages, costs, and other expenses incurred by OCWRC that arise out of the negligent acts, errors, or omissions of Ric-Man, its agents, consultants, employees, or representatives, which may include, without limitation, liability, damages, or expenses

KOTZ SANGSTER WYSOCKI P. C.   ATTORNEYS AND COUNSELORS AT LAW

Document received by the MI Wayne 3rd Circuit Court.

7

incurred or which may be incurred in relation to work performed by Ric-Man and/or its subcontractors/subconsultants, and liability, damages, or expenses incurred or which may be incurred in relation to the repair and/or replacement of any wells.

28.     There is an actual and justiciable controversy between OCWRC and Ric-Man, concerning whether Ric-Man must indemnify OCWRC for all liabilities, claims, causes of action, lawsuits, liens, injuries, damages, losses and expenses" which are "caused by, arising out of, resulting from or occurring in connection with . . . [Ric-Man's] breach of, or failure to comply with, the [Contract]." (See Article 52 of the General Conditions).

29.     A present adjudication of the controversy is necessary to guide OCWRC's future conduct and preserve legal rights.

30.     Declaratory relief will avoid a multiplicity of actions and/or avoid potential conflicts between the indemnitor (Ric-Man) and indemnitee (OCWRC) in the future.

WHEREFORE, OCWRC respectfully requests this Court enter a judgment in favor of OCWRC and against Ric-Man, which declares Ric-Man must indemnify OCWRC under, and consistent with, the terms of the Contract, for, including, but not limited to, Wade Trim's claims against OCWRC for breach of contract and unjust enrichment in Wade Trim's First Amended Complaint. Further, OCWRC respectfully requests this Court enter a judgment in favor of OCWRC and against Ric-Man in an amount to be determined at trial, plus all applicable attorney's fees, costs, and interest.

Respectfully submitted,

**KOTZ SANGSTER WYSOCKI P.C.**

/s/ R. Edward Boucher

By:   Jeffrey M. Sangster (P30791)
       R. Edward Boucher (P57251)
       Mark F.C. Johnson (P80539)
Attorney for OCWRC
400 Renaissance Center, Suite 3400
Detroit, MI 48243
(313) 259-8300
jsangster@kotzsangster.com
rboucher@kotzsangster.com
mjohnson@kotzsangster.com

Date:  April 19, 2019

KOTZ SANGSTER WYSOCKI P.C., ATTORNEYS AND COUNSELORS AT LAW

Document received by the MI Wayne 3rd Circuit Court.

9

# Exhibit D



# CROSSWALKCLAIMS
## — MANAGEMENT LLC —

Charles J. Sinclair
Head of Claims
Direct Dial 860-470-5007
csinclair@crosswalkclaims.com

November 8, 2019

***SENT VIA E-mail to facilitate receipt***
Ted Peters, Esq.
McAlpine PC
3201 University Drive, Suite 100
Auburn Hills, MI 48326
tpeters@mcalpinelawfirm.com

## COVERAGE POSITION LETTER

| | |
|---|---|
| Claim No.: | PS19017 |
| Insured: | Ric-Man Construction, Inc. (hereinafter "Ric-Man" or "Named Insured") |
| Insurer: | Pioneer Underwriters – Syndicate Number 1980 |
| Policy No.: | CPP-0000190-01 (hereinafter the "Policy") |
| Policy Period: | December 15, 2018 – June 30, 2020 |
| Retroactive Date: | April 15, 2011 (for Coverage B) |
| Claimant: | Wade Trim Associates, Inc./Oakland County Water Resources Commissioner |
| Loss Date: | TBD |

Dear Mr. Peters:

As you are aware, Crosswalk Claims Management, LLC ("Crosswalk") is the designated third-party administrator authorized to handle claims on behalf of Certain Underwriters at Lloyds and, more specifically, Pioneer Underwriters –Syndicate Number 1980 (hereinafter "Underwriters").

On behalf of Underwriters, Crosswalk has been investigating coverage under the Policy for this matter. Underwriters investigation is being undertaken pursuant to a full and complete reservation of rights under the Policy and the law. The purpose of this letter is to advise you that our investigation is ongoing, as there are numerous outstanding document and information requests, as well as potential

Page 1 of 10



coverage issues that may preclude and/or limit coverage for this matter. The balance of this letter sets forth the facts and policy language particular to this matter.

### Communication

Initially, we note that we have made several attempts to secure information and documents directly from the Named Insured, but the Named Insured has directed Underwriters to communicate our information and document requests directly to you, as their attorney. Our understanding is that you are authorized to receive communications and act on the Named Insured's behalf concerning our ongoing coverage investigation. If that understanding is not correct, please immediately let me know. Whilst we endeavor to abide by the Named Insured's request to communicate with you directly on coverage issues, given the nature of the coverage issues discussed herein and the pending request for your firm to act as Independent Counsel on this matter, I have included the insured as a recipient of this correspondence.

### Underlying Facts

This matter arises out of the Middlebelt Transport and Storage Tunnel project in Farmington Hills, Michigan (the "Project"). On or about September 18, 2014, Ric-Man entered a contract with the Oakland County Water Resources Commissioner ("OCWRC") for Ric-Man to serve as the General Contractor and perform construction services for the Project, and the contract required substantial completion of the work by September 17, 2016. Ric-Man entered into a sub-contract with GEI Associates for the design of a dewatering system for the Project.

On or about May 21, 2018, Wade-Trim Associates, Inc. filed a lawsuit against both Ric-Man and OCWRC seeking damages relating to the Project. At some point, Ric-Man entered into a Tolling Agreement with GEI relating to claims arising from the dewatering system design work. On or about April 19, 2019, OWRC filed a Cross-Claim against Ric-Man alleging Breach of Contract and seeking a Declaratory Judgment for Contractual Indemnification against Ric-Man relating to the allegations set forth in the May 2018 Wade-Trim Complaint.

On or about June 17, 2019, Ric-Man first notified Underwriters of this matter.

### Ongoing Investigation and Document/Information Requests

We note that, whilst the underlying litigation has been pending since May 2018 and there appear to have been substantial communication between the parties as to the Project and the claim prior to the filing of the May 2018 lawsuit, Underwriters were not notified of this matter until June 17, 2019. Since that time, we have been investigating coverage for this matter. We appreciate your cooperation with our investigation, but we note there are outstanding document and information requests for which we still require responses. To assist with your gathering of information and documents, we reproduce below the outstanding document and information requests:

Page 2 of 11



- A complete copy of Ric-Man Construction's contract for the noted Project, including the dates Ric-Man Construction worked on the project;
- All correspondence relating to interactions with Wade Trim or OCWRC, or their representatives, including any prior claim or demand letters, any responses thereto and any internal reports/memos relating to the allegations in the underlying Complaint or Cross-Complaint;
- A complete copy of the underlying Complaint by Wade Trim Associates, Inc. and Ric-Man's Answer and Cross-Claims/Third Party Complaints, including any Amended or Revised versions of same;
- Any claim or demand letters sent to GEI or any other entities relating to the design, and any tolling agreements entered into regarding this matter;
- When and how did Ric-Man Construction first become aware of this matter

**Policy Provisions**

A Contractors Pollution and Professional Liability Policy was issued to Ric-Man under Policy No.: CPP-0000190-01 with effective dates of December 15, 2018 through June 30, 2020.[1] A claim has been presented for consideration under Coverage B, Professional Liability, which carries a limit of liability of $5 Million per claim and $5 Million in the aggregate, with a retroactive date of April 15, 2011. Additionally, the Policy contains a $25,000 self-insured retention.

The Policy is a claims-made and reported Policy and subject to its provisions applies only to claims which are both first made against the insured and reported to the insurer during the Policy period or the extended reporting period, if applicable.

Please note that while the entire Policy is incorporated herein by reference, there are provisions within the Policy which may define, limit, or exclude coverage for this matter, and we draw your attention to the following Policy provisions which may apply to this claim:

*I. INSURING AGREEMENT*

*Coverage B – Professional Liability*

*The **Insurer** shall pay on behalf of the **Insured** all sums in excess of the Self-Insured Retention stated in the **Declarations** which the **Insured** is legally obligated to pay as **Damages** because of a **Professional Claim** first made against the **Insured** during the **Policy Period** and reported to the*

---

[1]Policy was written with Coverages A-G. Coverages A, C, D, E, F, and G do not appear to apply to the instant matter. As such, Coverages, A, C, D, E, F, and G will not be contemplated further. The within claim has been submitted for consideration under Coverage B, Professional Liability.



*Insurer,* in writing, during the **Policy Period**, or any applicable **Extended Reporting Period**, provided that:

1.  the **Professional Claim** arises out of an actual or alleged act, error omission with respect to the rendering of or failure to render **Professional Services** by the Insured or by a **Design Professional** for whom the **Insured** is legally responsible; and

2.  the act, error, or omission took place on or after the **Retroactive Date** specified in the **Declarations** and before the end of the **Policy Period**.

****

**IV.   DEFINITIONS**

F.   **Damages** means the monetary amounts for which the Insured may be held legally liable, including sums paid as judgments, awards, settlements, partial or complete loss, or diminishment of value, and related Claim Expense, resulting from a Professional Claim.  Damages also include liquidated damages, but only to the extent of liability the Insured would have had in the absence of an agreement for liquidated damages.

Damages does not include the restitution, return, withdrawal or reduction of fees, profits or charges for services rendered or offered, or any other consideration or expenses paid to the Insured or by the Insured for services or products; any equitable obligation, including restitution, disgorgement, or the cost of complying with injunctive relief; or (except as provided in Section III.B. Litigation Expense Reimbursement) the time and expense incurred by an Insured in addressing or resolving a claim.

H.   **Design Professional** means those persons or entities or successors professionally qualified to perform **Professional Services**.

I.   **Design Professional's Insurance** means all available professional liability insurance policies where the Design Professional is an Insured, including any respective sub consultant.

Y.   **Professional Claim** means any demand, demand for arbitration or mediation or suit received by an **Insured** seeking **Damages** or correction of **Professional Services** and alleging liability or responsibility on the **Insured's** part or on the part of any entity or person for whom the **Insured** is legally responsible.

Z.   **Professional Services** means:



**CROSSWALKCLAIMS**
—— MANAGEMENT LLC ——

1.  *environmental consulting, environmental engineering, environmental site assessment, remedial investigation, feasibility studies, environmental monitoring, testing and sampling, remedial oversight and management, ecological studies, industrial hygiene, environmental training, forensic inspection, expert witness, or*

2.  *construction management, program management, project management, owner's representation and any design delegated responsibility or design assist performed by the Insured, including but not limited to constructability reviews or value engineering, or*

3.  *architecture, engineering, or contract administration as part of design, sprinkler design, fire protection design, life safety design, mechanical electrical or security systems design, light use, acoustical or signage design, landscape design, surveying, quantity surveying, material testing, economic feasibility, technical consulting or studies, software design for the purpose of operating or maintaining any building system, interior design or space planning services, or design services to support Leadership in Energy and Environmental Design (LEED) certification for a project, or*

4.  *professional services in connection with modification or alteration, transfer, protection, manipulation, use or misuse of any Building Information Modeling (BIM) design assist system or program, or*

5.  *ordinary technology services performed in the course of Professional Services described above.  Such technology services include the design, development, programming, analysis, training, use, hosting, management, support and maintenance of any software, database, internet service, or website.*

**Professional Services** *shall not include any activity in connection with construction means, methods or techniques; site safety; crane erection, use, maintenance or operation; scaffolding; any temporary structure; or project fencing.*

**EE.**     **Retroactive Date(s)** *means the date(s) set forth in item E. of the **Declarations** and from which coverage as provided herein first begins.*

****



### V. EXCLUSIONS

This Policy does not apply and the **Insurer** will not be liable to make payments or indemnify any **Insured** for **Ultimate Loss, Damages, Mitigation Costs** or, a **Pollution Loss**, or a **Protective Claim**, or a **Professional Claim**, or a **Pollution Claim**, or **Claim Expense** directly or indirectly arising out of: . . .

### A. Protective Claim Legal Fees
Attorney's fees and any other costs and expenses incurred by any **Insured** in connection with the making and prosecution of a **Protective Claim**;

### F. Faulty Workmanship/Own Work
the cost to repair or replace faulty workmanship in any construction, erection, fabrication, installation, assembly or manufacturing process performed or provided by any **Insured** or anyone for whom any **Insured** is legally responsible, including materials, parts or equipment furnished in connection therewith, but this exclusion does not apply to liability arising from services of a **Design Professional** or **Contractor Activities** that result in a **Pollution Condition**;

### I. Known Condition(s)/Prior Notice

1. any claim or circumstance reported under any prior policy; or

2. any act, error, omission, or circumstance occurring prior to the inception date of this Policy that was known or reported to a **Responsible Person** who could have reasonably foreseen that a claim or mitigation effort could result; or

3. any **Pollution Condition** existing prior to the inception date of this Policy, and reported to a **Responsible Person**, provided such **Pollution Conditions** were caused by operations performed by or on behalf of the **Insured**. This exclusion shall apply to any claim, suit, demand, notice or governmental order or directive seeking **Damages** or any other remedy of any kind, including, but not limited to money, repairs, remediation for **Pollution Conditions**, and prohibits any defense of the **Insured** where



the **Insured** knew or should have reasonably known of the **Pollution Conditions**, injury or **Damages** prior to the effective date of this Policy;

**J.**      **Contractual Liability**

Liability assumed by any **Insured**, or any entity or person for whom the **Insured** is legally responsible, under any contract or agreement, unless such liability would have attached by law in the absence of such contract or agreement. This exclusion shall not apply to an **Insured Contract**, nor shall this exclusion apply to liability arising out of **Pollution Conditions**;

**K.**      **Express Warranties/Guarantees**

express warranties or guarantees unless such liability would have attached by law to the **Insured** in the absence of such warranty or guarantee;

**\*\*\*\***

**X.**    **CONDITIONS**

**Q.**      **Other Insurance**

If there is other valid and collectible insurance, then the Insurer shall not be liable except to the extent that the loss exceeds such other valid and collectible insurance.

**\*\*\*\***

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
**PRIOR NOTICE EXCLUSION**

This endorsement is a part of your Policy. Except for the changes it makes, all other terms of the Policy remain the same and apply to this endorsement:

**PRIOR NOTICE EXCLUSION [Endorsement No. 10]**

In consideration of the premium paid, it is hereby understood and agreed that this Policy will not apply to:

Any prior, current or future claims, losses, incidents, "bodily injury", "property damage", "pollution event", "pollution condition", "claim expenses" or "supplementary payments"

Page **7** of **11**



*arising from, related to, caused by, resulting from, contributed to or in any way related to:*

> *Any actual or potential Pollution Condition, Pollution Event, Pollution Claim or Professional Liability Claims previously reported to any prior insurer with respect to any insurance policy procured by or for the benefit of any Insured; or*

> *Any actual or potential Pollution Condition, Pollution Event, Pollution Claim or Professional Liability Claim that was known by any Insured prior to the effective date of this policy and which could have been reported to any prior insurer under any insurance policy procured by or for the benefit of any Insured.*

****

## I. PROFESSIONAL CLAIM MADE PRIOR TO THE POLICY INCEPTION

The Policy requires that any Professional Claim first be made against Ric-Man during the Policy Period of December 15, 2018 through June 30, 2020. The underlying Complaint was filed by Wade Trim Associates against Ric-Man on or about May 21, 2018. Although the Cross Claim by OCWRC was not filed until on or about April 19, 2019, the allegations within the Cross Claim appear to relate directly to those within the underlying Complaint. Subject to the receipt and review of previously-requested documents referenced above and pursuant to a complete reservation of all rights under the policy and the law, the Policy does not appear to be triggered, as the Claim was first made against Ric-Man prior to the Policy Period.

## II. AN ACTUAL OR POTENTIAL PROFESSIONAL CLAIM WAS KNOWN BY RIC-MAN PRIOR TO THE EFFECTIVE DATE OF THE POLICY

Pursuant to the Known Condition(s)/Prior Notice Exclusion and Endorsement No. 10 – Prior Notice Exclusion, the Policy precludes coverage for any actual or potential Professional Claim known by the Insured prior to the Policy effective date of December 15, 2018. The Policy defines Professional Claim to include claims against those entities for whom Ric-Man is legally responsible. To the extent there was not an actual Professional Claim made against Ric-Man prior to the Policy Period, it appears that Ric-Man was aware of a potential Professional Claim prior to the Policy Period. In addition to the demands relating to missing the September 17, 2016 substantial completion date for the Project, Ric-Man appears to have been directly aware of at least a potential Professional Claim against itself or GEI, as a subcontractor to Ric-Man and an entity for which Ric-Man would be legally responsible. To wit, Ric-Man entered into a Tolling Agreement with GEI and otherwise worked with OCWRC in pursuing GEI for alleged design issues. Subject to the receipt and review of previously-requested documents referenced above and pursuant to a complete reservation of all rights under the policy and the law, the Policy does