UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RIC-MAN CONSTRUCTION, INC.,

                    Plaintiff,                         Case Number 19-13374
v.                                                     Honorable David M. Lawson

PIONEER SPECIAL RISK INSURANCE
SERVICES, INC. d/b/a PIONEER
UNDERWRITERS,

                    Defendant.
_____/

## OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT

In this insurance coverage dispute, plaintiff Ric-Man Construction, Inc. moves for

summary judgment declaring that defendant Pioneer Special Risk Insurance Services, Inc.

breached its duty to defend, and ultimately to indemnify, the plaintiff in litigation ending in a state

court. The record amply indicates that factual matters must be resolved before the fact of coverage

can be determined. The motion for summary judgment, therefore, will be denied.

I.

Most of the circumstances of a troubled water drainage construction project and resulting

underlying litigation are undisputed. The main question presented is whether the claims for which

plaintiff Ric-Man seeks a defense and indemnity fall within the coverage period of the insurance

policy defendant Pioneer issued.

A. The Policy

Pioneer issued a policy of insurance to Ric-Man Construction, Inc. which was in effect

from December 15, 2018 through June 30, 2020. The claims-made policy provided coverage for

any "professional claims" made against the plaintiff by any entity alleging deficiency of its work

as a commercial construction contractor, and it also provided that the defendant had a duty to defend the insured in any related litigation.

Section I(B) of the insurance policy at issue, which was labeled "Professional Liability," stated the following coverage:

> The Insurer shall pay on behalf of the Insured all sums in excess of the Self-Insured Retention stated in the Declarations which the Insured is legally obligated to pay as Damages because of a Professional Claim first made against the Insured during the Policy Period and reported to the Insurer, in writing, during the Policy Period, or any applicable Extended Reporting Period, provided that . . . the Professional Claim arises out of an actual or alleged act, error, or omission with respect to the rendering of or failure to render Professional Services by the Insured or by a Design Professional for whom the Insured is legally responsible.

Policy, ECF No. 20-2, PageID.458. The "Policy Period" was defined in the declarations as December 15, 2018 through June 30, 2020. *Id.* at PageID.456. The declarations further stated that "Section I. Coverages A, B and F of this Policy provide claims made and reported coverage [that applies] only to claims which are both first made by or against the insured and reported to the insurer during the policy period." *Ibid.*

The policy defined the term "Professional Claim" as "any demand, demand for arbitration or mediation or suit received by an Insured seeking Damages or correction of Professional Services and alleging liability or responsibility on the Insured's part or on the part of any entity or person for whom the Insured is legally responsible." *Id.* at PageID.466. The term "Professional Services" was defined to include "construction management, program management, project management, owner's representation and any design delegated responsibility or design assist performed by the Insured, including but not limited to constructability reviews or value engineering." *Ibid.*

The policy stated the following about "Multiple Claims":

> Two or more . . . Professional Claims . . . arising out of a single act, error, omission [or] incident . . . or arising out of a series of acts, errors, omissions or incidents related to each other, will be considered a single claim subject to a single Each Claim Limit of Liability and one Self-Insured Retention. . . . All such claims,

whenever made, shall be considered first made during the Policy Period as of the date the earliest claim was first made.

*Id.* at PageID.472.  The policy in its original form had included a choice of law provision stating that it would be governed by the law of the State of New York, but that provision was deleted without substitution by an endorsement.

### B. The Project

According to the pleadings in the underlying state court action, in September 2014, the Oakland County Water Resource Commission (OCWRC) awarded Ric-Man a contract for a project known as the Middlebelt Transport and Storage Tunnel, the purpose of which was to transmit "combined overflow" runoff and wastewater.  The contract included a designation of Wade Trim Associates, Inc. to provide engineering services for the project.

One phase of the construction required the drilling of "groundwater control" dewatering wells, which involved numerous bores and pumping stations.  According to Wade Trim, Ric-Man failed to provide complete and accurate reports about site conditions and how it drilled those wells, which was contrary to the detailed specifications in the contract.  Ric-Man allegedly drilled many of the wells to depths far greater than stated in plan documents and reports that were transmitted to Wade Trim, effectively dewatering a neighborhood.  It also failed diligently to monitor the effect of groundwater removal on nearby residential wells.  When complaints arose that residential wells had run dry due to Ric-Man's careless work, Wade Trim was forced to undertake expensive redesign work on the project to correct the impact — work for which it allegedly never was paid fully by the County.  Wade Trim alleged that Oakland County was liable for the unpaid work under the contract, and it also alleged that Ric-Man contractually was obligated to indemnify it for any damages sought by the County due to the project's impact on residential water supplies.

C. The State Court Litigation

On May 29, 2018, before Pioneer's insurance policy went into effect, non-party Wade Trim Associates, Inc. filed an amended complaint in the Wayne County, Michigan circuit court pleading claims for breach of contract against the OCWRC and plaintiff Ric-Man.  Wade Trim pleaded three counts: (1) breach of contract against Ric-Man, (2) breach of contract against the OCWRC, and (3) unjust enrichment against the OCWRC.  The first count recited numerous provisions of a contract between the OCWRC and Ric-Man that defined the work to be performed in the ground water control project.  The salient provisions stated that the County had retained Ric-Man to perform the ground water control work, that Wade Trim was designated as the engineer for the project, and that Ric-Man agreed to indemnify Wade Trim against all claims "arising out of, resulting from or occurring in connection with [] [Ric-Man's] breach of, or failure to comply with, the Agreement," except to the extent that any damages were caused solely by the negligence of Wade Trim in performing its design engineering work.  Mot. Summ. J. Ex. 1, ECF No. 20-2, PageID.408-09.  The amended complaint pleaded that Ric-Man had breached the contract in numerous respects, but principally by (1) drilling drainage wells to depths far below those that were specified by the project specifications, and which were reported in diaries of the drilling work that were returned by Ric-Man, (2) after becoming aware that the wells had impacted nearby residential water supplies, failing to halt use of the improperly drilled wells, and (3) failing to correct the faulty work or to come up with any plan to correct the problems.  *Id.* at PageID.415-16.

Wade Trim further alleged that Oakland County then demanded that it perform redesign work to fix the problems affecting the residential wells, and it did so, but the County subsequently refused to pay Wade Trim for more than $500,000 in costs for its redesign work.  Wade Trim

alleged that as a result of Ric-Man's failure to comply with the specifications and performance obligations under the contract, it had suffered extensive damages due to those breaches.

The amended complaint quoted several contract provisions and alleged that Ric-Man breached them.  Of note is the reference to the Specification Section 31-2319, which defines the scope of the work as follows: "The Contractor [Ric-Man] will be responsible for design of groundwater control system components . . . ."  *Id.* at PageID.411.  The contract also required Ric-Man to "[s]ubmit design and support data for all excavations where dewatering or depressurization is necessary to maintain a stable and dry excavation," and to "[s]ubmit working drawings of the groundwater control system . . . ."  *Id.* at PageID.411.  Wade Trim alleged that Ric-Man "failed to perform each and every one of the obligations required by the Contract Documents, specifically failing to perform in accordance with Articles 10 and 23 of the General Conditions, and in accordance with Specification Sections 31-2319 . . . ."  *Id.* at PageID.416.

As noted above, all of that occurred, and Wade Trim's claims were made, before the effective date of Pioneer's policy.

On April 19, 2019, after the policy coverage commenced, OCWRC filed a cross-claim in the Wayne County litigation pleading similar claims for breach of contract and indemnification, alleging that Ric-Man had failed to perform its work under the contract safely and prudently in conformance with detailed specifications for the construction and operation of the groundwater control systems.  OCWRC also alleged that Ric-Man was obligated to cover any losses due to residential well depletion, road closures, and delays in completing the work, as well as any claims by aggrieved parties such as Wade Trim for unpaid expenses of corrective work.

OCWRC's crossclaim referenced Ric-Man's design, supervision, and performance obligations and alleged that Ric-Man's breaches included "[f]ailing to properly design

- 5 -

groundwater control systems (as alleged by Wade Trim in Wade Trim's First Amended Complaint)." Mot. Summ. J. Ex. 1, ECF No. 20-7, PageID.515. The other failure-of-performance allegations also mimicked Wade Trim's complaints, including "failing to account for the possibility of damage to residential wells," "failing to advise OCWRC that groundwater control activities might impact surrounding structures and residential wells," "damaging existing structures while operating groundwater control systems," "failing to install and perform [sic] groundwater control systems in accordance with approved submittals regarding well depth and pump depth," and "failing to perform pump tests promised by its submittals." *Id.* at PageID.515. The County contended that it had suffered losses due to those failures including expenses to fix damage to Middlebelt Road, claims by residents whose wells had failed, and excess expenses that Wade Trim had submitted for corrective work to repair the damage that was done.

### D.  Procedural History

Ric-Man filed its complaint for declaratory relief in this Court on November 15, 2019. It filed its motion for summary judgment on April 15, 2020, before formal discovery substantially had commenced. Both parties filed earlier motions for summary judgment but withdrew them. Discovery closed on February 22, 2021.

Pioneer's position in this litigation has been that it is not obligated to appear and defend Ric-Man in the underlying state court case because in its view the original complaint that was filed by Wade Trim (before the policy commenced) and the cross-claim filed by the County (after the policy commencement date) are considered to be a "single claim" as defined by its policy language, and that "one claim" first arose outside the coverage period.

Through previous motion practice, Ric-Man has resisted discovery based on its view that the entire dispute can be decided on the pleadings and by considering exclusively information that is disclosed within the "eight corners" of the pertinent underlying documents (the insurance

contract and the crossclaim).  In rejecting that position, the Court held that Pioneer was entitled to discovery to develop its coverage defense, because the state decisions on point had acknowledged that the resolution of duty-to-defend claims may depend on consideration of facts beyond those apparent solely from a facial review of the underlying pleadings and the policy language.  Before the Court issued that ruling, the plaintiff already had filed the instant motion for summary judgment as a matter of law, and its argument depends principally on the same flawed premise that "no discovery" is necessary to resolve this suit.  Discovery closed just a few days ago and well after the briefing on this motion was completed.  Thus, the record presently before the Court is incomplete and does not allow for a full recitation of the operative facts of the underlying claims.

## II.

Despite the state of the record at the time, Ric-Man filed its motion as one for summary judgment, where it must show that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  Ric-Man can prevail on such a motion only if the Court, viewing all the evidence and drawing all reasonable inferences in favor of Pioneer, can determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

When the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden. *Vance v. Latimer*, 648 F. Supp. 2d 914, 919 (E.D. Mich. 2009); *see also Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992); *Stat–Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1335 (D. Colo. 1997) (stating that where "the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, summary judgment can be

entered only if the movant submits evidentiary materials to establish all of the elements of the claim or defense"). The plaintiff therefore "must sustain that burden as well as demonstrate the absence of a genuine dispute. Thus, it must satisfy both the initial burden of production on the summary judgment motion — by showing that no genuine dispute exists as to any material fact — and the ultimate burden of persuasion on the claim — by showing that it would be entitled to a directed verdict at trial." William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477-78 (1992) (footnotes omitted).

Because this is a diversity action, the Court must follow state substantive law, as prescribed by the state's highest court. *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938). If the state supreme court has not addressed a determinative point of law, this Court "must predict how it would resolve the issue from 'all relevant data.'" *Kingsley Associates, Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 1995) (citing *Bailey v. V & O Press Co., Inc.*, 770 F.2d 601, 604 (6th Cir. 1985)). "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [state's highest court] would decide otherwise." *Ibid.* (citing *FL Aerospace v. Aetna Casualty and Surety Co.*, 897 F.2d 214, 218-19 (6th Cir. 1990)).

A.

Ric-Man contends that New York law may govern this dispute, because the insurance policy contained a choice-of-law provision designating the law of New York as the rules for decision. That section, however, was deleted by endorsement and no replacement state's laws were designated. Pioneer says Michigan law governs.

"In diversity cases [a federal court applies] the choice-of-law rules . . . of the forum state, which is Michigan in this case." *CenTra, Inc. v. Estrin*, 538 F.3d 402, 409 (6th Cir. 2008). The

parties have not identified any substantive differences between New York and Michigan law relevant to this dispute.  In the usual case where the parties agree that there is no actual conflict of law, their concurrence forecloses the need to engage in a precise evaluation of which law should be applied, and the Court simply may apply the uniform rule that prevails in the relevant jurisdictions.  *CenTra*, 538 F.3d at 409.  However, in this case the plaintiff's misconstruction of the governing legal principles compels the Court to determine with certainty which forum's decisional law should be consulted to discern the correct rule.

When determining the appropriate situs of the law for a policy of insurance that does not include an express choice of law provision, the Court "must consider the following five factors, as instructed by the Michigan Supreme Court: place of contracting, place of negotiation, place of performance, location of the subject-matter of the contract, and place of incorporation of the parties."  *Whitehouse Condo. Grp., LLC v. Cincinnati Ins. Co.*, 569 F. App'x 413, 415 (6th Cir. 2014).  These factors all point to the application of Michigan law in this case.

The policy was issued to a Michigan entity, so "Michigan is the place of contracting and negotiation."  *Liberty Mut. Fire Ins. Co. v. Holka*, 984 F. Supp. 2d 688, 694 (E.D. Mich. 2013). The incident for which coverage is claimed, and the underlying lawsuit, both occurred in Michigan. Michigan therefore will be the place of performance both for defense and for coverage, if any ultimately is obtained.  *Ibid.*  Moreover, where the contract at issue is a policy of insurance, the forum where the risk is located — here, in Michigan — has a compelling and usually controlling interest in the application of its law.  *Ibid.* ("[W]here the location of the subject matter of the contract is a risk, the state where the risk is located will have a natural interest in transactions affecting it. Here, the insured home, and therefore the location of the lion's share of the risk, is in Michigan." (citations and quotations omitted)).  The insured is incorporated in Michigan and the

insurer elsewhere, so that factor is neutral.  On similar facts, federal courts applying Michigan law readily have concluded that "Michigan has the most significant interest" in the construction and application of the policy.  *Id.* at 695.  Neither party objects to the application of Michigan law. The Court's analysis of the duty to defend will be guided by the Michigan decisions on point.

B.

In its pre-suit letter to Ric-Man, Pioneer's claims administrator identified eight reasons why coverage may not be available for Ric-Man's claim.  The first two reasons may be dispositive: that the allegations in OCWRCs crossclaim against Ric-Man related directly to Wade Trim's claim raised in the original complaint, and Ric-Man's knowledge of the "Professional Claim," both occurred before the insurance policy's effective date.  Pioneer's position, consequently, is that coverage was not triggered by the claim Ric-Man made, even though the OCWRC's crossclaim was not filed until after the policy took effect.  Ric-Man insists, however, that the claims are separate, and Pioneer had a duty to defend it on the crossclaim in the state court action.

The parties agree that the policy at issue is of the species denoted by Michigan courts as a "claims made" policy, "in which coverage is provided for those claims which are discovered and brought against the insurer during the term of the policy."  *Frankenmuth Mut. Ins. Co. v. Eurich*, 152 Mich. App. 683, 686-87, 394 N.W.2d 70, 72 (1986).  Under Michigan law, "[i]t is well settled that 'if the allegations of the underlying suit arguably fall within the coverage of the policy, the insurer has a duty to defend its insured.'"  *Radenbaugh v. Farm Bureau Gen. Ins. Co. of Michigan*, 240 Mich. App. 134, 137, 610 N.W.2d 272, 275 (2000) (quoting *Royce v. Citizens Ins. Co.*, 219 Mich. App. 537, 543, 557 N.W.2d 144, 147 (1996)).

The parties agree that the allegations in the crossclaim arguably include a "Professional Claim," as Pioneer's policy defines that term.  Ric-Man insists that is all we need to know to

- 10 -

determine coverage, since the crossclaim indubitably was filed within the policy period. And Ric-Man says that Pioneer (nor the Court) can look beyond that pleading and the insurance policy to determine coverage and Pioneer's concomitant duty to defend. That narrative, however, does not tell the whole story.

Under Michigan law, the duty of an insurer to defend its insured against a claim "arises only with respect to insurance afforded by the policy. If the policy does not apply, there is no duty to defend." *Am. Bumper & Mfg. Co. v. Hartford Fire Ins. Co.*, 452 Mich. 440, 450, 550 N.W.2d 475, 481 (1996). Michigan courts take an expansive view of the duty to defend, which is "broader than the duty to indemnify. If the allegations of a third party against the policyholder even arguably come within the policy coverage, the insurer must provide a defense." *Id.* at 450-51, 550 N.W.2d at 481. "This is true even where the claim may be groundless or frivolous. *Id.* at 451, 550 N.W.2d at 481. But "[t]he duty to defend cannot be limited by the precise language of the pleadings," because "[t]he insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible." *Id.* at 452, 550 N.W.2d at 481 (citing *Shepard Marine Const. Co. v. Maryland Cas. Co.*, 73 Mich. App. 62, 65, 250 N.W.2d 541, 542 (1976)).

Pioneer says that one need not look far beyond the crossclaim to make this determination. The principal amended complaint in the state court action furnishes information to answer the question whether a covered claim was made against Ric-Man within the policy period. Ric-Man acknowledges that Wade Trim certainly made a claim against it, but Ric-Man contends that none of Wade Trim's allegations amount to a "Professional Claim," that is, a demand for damages arising from Ric-Man's "Professional Services." Ric-Man argues that Wade Trim's grievances were confined to defects in Ric-Man's physical work and did not extend to any "construction management, program management, project management, owner's representation and any design

delegated responsibility or design assist," which Pioneer's policy described as "Professional Services." But the documents — including the amended complaint filed in state court — do not support that position. As discussed earlier, Wade Trim's amended complaint alleges defective performance both as to Ric-Man's "project management" and "design delegated responsibility or design assist."

The policy language here expressly defines the term "Professional Claim" in a way that contemplates that various claims for relief against an insured will be regarded as a "single claim" where they all "aris[e] out of a series of acts, errors, omissions or incidents [that are] related to each other." The policy further states that "[a]ll such claims, whenever made, *shall be considered first made during the Policy Period as of the date the earliest claim was first made*." (Emphasis added). A "claim" is not limited to a lawsuit; it can be "*any* demand . . . received by an Insured seeking Damages or correction of Professional Services and alleging liability or responsibility on the Insured's part." (Emphasis added).

The plaintiff asserts that it never was made aware of any "defective design" claim until the County filed its crossclaim. But both pleadings allege numerous breaches of Ric-Man's obligations under the contract that apparently relate to duties that include the "design" of the ground well system. Both pleadings also allege other performance failures by Ric-Man. But it is fair to say that the amended complaint also includes a claim for defective "Professional Services." And because a lawsuit frequently is not the first step in addressing business disputes, Pioneer has sought discovery to learn if Ric-Man received any other pre-policy demand to correct its defective Professional Service. The current record does not answer that question fully.

Michigan law generously recognizes an insurer's duty to defend the insured from suit: "If coverage is at all arguable, then an insurer must defend the insured." *Hamilton Specialty Ins. Co.*

- 12 -

*v. Transition Inv., LLC*, 818 F. App'x 429, 432 (6th Cir. 2020) (citing *Polkow v. Citizens Ins. Co. of Am.*, 438 Mich. 174, 178, 476 N.W.2d 382, 383 (1991)). But here, the policy's definitional language suggests the possibility — even the likelihood — that the allegations in both pleadings in the underlying litigation may be construed according to a reasonable reading of the policy language as a "single claim," which first was presented before coverage commenced. If that is proven, then coverage is barred, and if coverage is barred, then no duty to defend was triggered. *Hamilton*, 818 F. App'x at 433 ("To defend or not to defend: That is the question Hamilton needed to answer when Transition informed it about the Wayne County litigation. Hamilton opted for the latter. Such a decision can be vindicated only if, on its face, the state court complaint ruled out coverage.").

Moreover, that potential failure of coverage does not depend inherently on any *exclusion* of coverage; it may result from the *absence of coverage* in the first instance. Thus, it cannot be said as a matter of law that the insurer had an unavoidable duty to defend, as may occur in cases where coverage facially is available, and the only defense raised is premised on exclusions that, if proven, may avoid the obligation to indemnify. *C.f. Hamilton*, 818 F. App'x at 435 ("[The insurer] cannot show that the policy's exclusionary clauses unarguably prohibited coverage. That's true even if the Michigan court might have ultimately found that the damages in this case resulted from [the insured's] statutory violations. To show [the insurer's] duty to defend, [the insured] doesn't have to give the winning argument — only a possible argument. And Michigan law doesn't rule out [the insured's] reading of the policy.").

III.

This dispute over insurance coverage cannot be resolved without the benefit of a fully developed record, and the plaintiff therefore is not entitled to judgment as a matter of law on its

duty to defend the claim without the benefit of a full evidentiary presentation.  Its motion is based on a false premise that nothing further is required to decide its case in its favor than what was stated in the underlying pleadings.  As that false premises fails, so must its premature motion for dispositive relief.

Accordingly, it is **ORDERED** that the plaintiff's motion for summary judgment (ECF No. 20) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  February 26, 2021